# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SUGARFINA, INC., *et al.*, | Case No. 19-11973 (KBO) |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION OF DEBTORS PURSUANT TO SECTIONS 105, 361, 362, 363, 364, AND 507 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 4001, AND LOCAL RULE 4001-2, FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS AND ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Sugarfina, Inc., a Delaware corporation ("SGRI"),[2] Sugarfina International, LLC, a Delaware limited liability company ("SGRLLC") and Sugarfina (Canada), LTD ("SGC" collectively with SGRI and SGRLLC, the "Debtors"), hereby file this motion (the "Motion") for the entry of an interim order (the "Interim Order") and a final order (the "Final Order") authorizing the Debtors to obtain postpetition financing in accordance with Debtor-In-Possession Loan and Security Agreement between the Debtors, on one hand, and SFCC Loan Investors, LLC, a Delaware limited liability company ("SFCC") and Candy Cube Holdings, LLC ("Candy Cube", and together with SFCC, individually and collectively, "DIP Lender"), on the other, a copy of which is attached to the proposed form of Order as **Exhibit "1"** (the "DIP Agreement" and, with related documents,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian Revenue Agency, as applicable are (1) Sugarfina, Inc., a Delaware corporation (4356), (2) Sugarfina International, LLC, a Delaware limited liability company (1254) and (3) Sugarfina (Canada), Ltd. (4480). The location of the Debtors' corporate headquarters is 1700 E. Walnut Ave., 5th Floor, El Segundo, California 90245.

[2] All capitalized terms not otherwise defined in this section shall have the meaning ascribed to same in the DIP Agreement.

the "DIP Documents") in the principal amount of $4,000,000.00, pursuant to sections 105(a), 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (a) to obtain postpetition financing in the form of the DIP Credit Facility (defined below), as such relief is more particularly described herein, (b) use of Cash Collateral (defined below) pursuant to sections 362 and 363, (c) scheduling a final hearing, (d) modifying the automatic stay, and (e) granting related relief.

In support of this Motion, the Debtors rely upon, and incorporate by reference, the Declaration of Lance Miller (the "First Day Declaration") and the Declaration of Adam Meislik in support of the Debtors' voluntary petitions (the "Chapter 11 Petitions") for chapter 11 relief, commencing the above-captioned chapter 11 cases (the "Cases") and the first day pleadings and applications (the "First Day Pleadings"), filed concurrently herewith, each of which is incorporated by reference as if set forth herein, and in further support of this Motion, the Debtors respectfully state as follows:

### JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

3.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.        The statutory bases for the relief requested herein are sections 105(a), 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 4001 and 9014, and Local Rule 4001-2.

## BACKGROUND

### A.    Summary of the Debtors' Business and Events Leading to Bankruptcy

5.        Sugarfina is an iconic candy and confectionary brand with a uniquely fresh, fashionable, and experiential approach to gourmet confections. With the creation of a "candy store for grown ups," Sugarfina has gained a strong and loyal customer following, through constant creation and innovation focused on distinctive product presentation and invention of fresh new candy offerings that delight and surprise. Its offerings are sourced from the finest candy makers in the world and include such iconic varieties as Champagne Bears®, Peach Bellini®, Sugar Lips®, Green Juice Bears®, and Cold Brew Bears™. Packaging design is also central to Sugarfina's edge—listed among "The World's Most Innovative Companies" list for 2018 by *Fast Company Magazine*, Sugarfina's presentation centers around the invention of the distinct Candy Cube™, Candy Bento Box®, and Candy Wall™. The result is an experience that is unique, attracting a significant social media following and a series of successful co-branding opportunities with brands like Casamigos, Disney, The Honest Company, Barbie, Nintendo, and Tito's Vodka.

6.        Since its founding in 2012 by entrepreneurs Josh Resnick and Rosie O'Neill, Sugarfina experienced explosive growth and success. By 2018, Sugarfina had established a strong international footprint, with operations in multiple countries and strong revenues projected across all of its channels. At the same time, however, Sugarfina struggled to become profitable. Macroeconomic conditions weighed against the Company, including headwinds impacting the broader retail sector and uncertainty regarding international partnerships; in addition, the Company

struggled to right-size its operations and control margins while also keeping up with growth and increasing demand. As a result, Sugarfina's continued success depended on its ability to tap new financing sources. Those efforts were successful for most of Sugarfina's tenure but the Company's most recent fundraising efforts fell short.

7. By early 2018, Sugarfina had raised more than $60.0 million from investors and operated without funded debt. The Company projected, however, that it would require additional liquidity by the end of the year, and thereupon commenced efforts to solicit interest in a new transaction from third-parties. Those efforts involved consideration and negotiation of multiple different deals, involving both debt and equity. None of those transactions were consummated, however, forcing the Company to raise short-term liquidity through secured debt in order to gain more time in order to locate long-term capital. By early 2019, the Company had amassed over $22,400,000 in short-term secured debt, and projected a need for additional liquidity beginning in June 2019.

8. Working with investment bankers Michel Dyens & Co. ("Michel Dyens"), the Company completed a fulsome and lengthy solicitation process to find new liquidity. The Company's process was open-ended, expressing a willingness to consider any type of transaction, with any terms (including complete or partial acquisitions, equity investments, or long-term debt transactions). Through that process, the Company contacted more than one hundred seventy (170) potential counterparties, with forty-two (42) parties signing confidentiality agreements and reviewing diligence regarding the Company. Ultimately, however, none of these parties were willing to proceed with an out-of-court transaction sufficient to address the Company's needs, forcing the Company to consider a bankruptcy filing.

11152210/2

9. The Company and its advisors approached numerous parties, including bidders who participated in the out-of-court financing solicitation, to discuss interest in a restructuring. Through those discussions, the Company, in its business judgment, agreed to terms with Candy Cube Holdings, LLC ("Candy Cube" or the "Stalking Horse") regarding a "stalking horse" bid to purchase the Company's assets. The Stalking Horse has agreed to purchase certain of the Company's assets, including the Company's brand and intellectual property, inventory, and certain retail stores (collectively, the "Purchased Assets"), for a purchase price of $13.0 million, plus membership units in Candy Cube accounting for Senior Preferred Membership Units with a $2.0 million liquidation preference and twenty percent (20.0%) of the Common Membership Units. Importantly, as a key part of the agreement, the Stalking Horse has negotiated for the opportunity to maintain all or a portion of Sugarfina's channels and operations and to offer employment to Sugarfina's employees.

10. The Debtors now file these Cases to complete the open and competitive process begun more than two (2) months ago, in order to sell substantially all of their assets and business lines, with Candy Cube acting as the Stalking Horse for the Purchased Assets. The Debtors intend to maintain their current operations while this sale process is ongoing with the goal of selling part or all of their businesses as a going concern—thereby necessitating the relief sought in the First Day Pleadings—and thereafter intend to discontinue operations, liquidate any remaining unsold assets and wind up their estates.

11. A more thorough and complete discussion of the Debtors' history, their operations and efforts surrounding the marketing of the Debtors' businesses is set forth in the First Day Declarations, which are incorporated herein.

**B.    The Debtors' Prepetition Indebtedness**

12.     As of the Petition Date, the Debtors had outstanding funded debt in the aggregate principal amount of $27.25 million, which is summarized as follows and described in more detail below:

a)  $5.0 million in unpaid principal of senior secured debt with SFCC Loan Investors, LLC ("SFCC");[3]

b)  $10.0 million of secured second lien debt with Goldman Sachs Specialty Lending Holdings, Inc. ("Goldman Sachs");

c)  $8.0 million of secured third lien subordinated debt with Josh Resnick;

d)  $2.15 million of secured fourth lien subordinated debt under Secured Convertible Promissory Notes issued to miscellaneous investors (collectively with SFCC, Goldman Sachs and Josh Resnick, the "Secured Creditors"); and

e)  $2.1 million of unsecured debt under Convertible Promissory Notes issued to miscellaneous investors.

**1.    Secured Debt**

13.     SFCC Facility.  On September 28, 2018, SGRI entered into a $4.4 million Loan and Security Agreement with Avidbank, which was subsequently assigned to SFCC and, on August 16, 2019, amended and restated (as amended and restated, the "SFCC Facility").  The SFCC Facility requires non-default rate interest payments equal to 9.99% per annum, and matured September 3, 2019.  The SFCC Facility is secured by a senior lien on substantially all of the assets of SGRI and SGC.  As of the Petition Date, $5.0 million remains outstanding under the SFCC Facility, plus accrued and unpaid interest, fees and expenses.

14.     Goldman Sachs Facility.  On November 28, 2018, SGRI entered into a Note Purchase Agreement with Goldman Sachs (the "Goldman Sachs Facility") for a principal amount of $10.0 million, secured by substantially all of the assets of SGRI and subject to a Lien

---

[3] SFCC prefunded an additional $600,000.00 a week prior to the Petition Date, and the Debtors are seeking permission to roll that amount into the DIP Credit Facility, which if approved would reduce the unpaid principal balance of the SFCC Facility to $4,400,000, plus interest and fees.

Subordination Agreement with SFCC. On February 28, 2019, SGC provided Goldman Sachs with a Second Lien Guarantee with respect to the Goldman Sachs Facility. The Goldman Sachs Facility accrues interest at an escalating rate, starting at LIBO + 9.50% and increasing to LIBO + 11.50% after May 31, 2019. The Goldman Sachs Facility matured on August 15, 2019. As of the Petition Date, $11,289,789 is outstanding (including accrued interest) under the Goldman Sachs Facility.

15. <u>Founder Loan</u>. Pursuant to a Secured Subordinated Promissory Note and Security Agreement dated July 23, 2018, Josh Resnick provided to the Company a revolver for up to $8.0 million (the "<u>Founder Loan</u>"). The Founder Loan is secured by substantially all of the assets of SGRI, subject to subordination agreements with respect to the SFCC Facility and the Goldman Sachs Facility. The Founder Loan accrues interest at 8.5% per annum and matures on July 23, 2023. As of the Petition Date, $8,712,253 is outstanding (including accrued interest) under the Founder Loan.

16. <u>Secured Convertible Notes</u>. Pursuant to a Note Purchase Agreement, dated as of June 12, 2019 and amended and restated as of June 24, 2019 (the "<u>Secured Convertible Notes</u>"), the Company issued Convertible Promissory Notes totaling approximately $2.15 million to various investors. The Collateral Agent for the Secured Convertible Notes is GHP Sugarfina Holdings, LLC, which is also a material owner of stock in the Company. The Secured Convertible Notes accrue interest at a rate of 8.0% per annum and, if not earlier converted into stock in the Company (triggered by the Company's sale of at least $15.0 million in new preferred stock), mature in June 2020.

17. <u>AFCO Insurance Facility</u>. On August 7, 2019, the Company entered into a Premium Finance Agreement with AFCO Acceptance Corporation (the "<u>AFCO Facility</u>"), for a principal amount of $235,169.06, in order to finance payments owed under the Debtors' Directors'

& Officers Insurance coverage. The AFCO Facility accrues interest at a rate of 5.770% per annum, and matures on July 30, 2020. It is secured by the proceeds of the Debtors' Directors & Officers' Insurance coverage.

## 2. Unsecured Debt

18. <u>Convertible Notes</u>. In October 2018, SGRI issued Unsecured Convertible Promissory Notes (the "<u>Convertible Notes</u>") to four (4) investors (collectively, the "<u>Convertible Noteholders</u>"). The Convertible Notes are subject to subordination agreements with respect to the Avidbank Facility and Goldman Sachs Facility. They accrue interest at a rate of 6.0% per annum, and provide for a maturity upon demand following twelve (12) months after their issuance dates. The Convertible Notes are convertible into a qualifying transaction involving the sale of new equity securities in the Debtors. As of the Petition Date, the aggregate amounts outstanding under the Convertible Notes (including accrued interest) totals $2,207,013.74

19. <u>Other Material Unsecured Debt</u>. The Debtors owe material amounts, on an unsecured basis, to vendors critical to their production process, including candy and packaging suppliers. These vendors provide material to the Debtors on an order-by-order basis, without long term contractual agreements.

## 3. Equity Interests

20. SGRI is privately owned, with eight classes of stock. The preferred stock is separated into seven classes – Series A, AA, A-1, B, BB, B-2, and BB-2 (collectively, the "<u>Preferred Stock</u>"). Each class of Preferred Stock has a 1.0x liquidation preference. Series A, AA, A-1, B-2, and BB-2 Preferred Stock each accrues dividends at 6.0% per annum, and Series B and BB Preferred Stock accrue dividends at 7.0% per annum. Series AA, BB, and BB-2 Preferred Stock is *pari passu* with respect to each other in priority, but senior with respect to Series A, A-1,

B, and B-2 Preferred Stock (which are classes are each *pari passu* among themselves). The Preferred Stock's liquidation preferences have priority over SGRI's common stock. As of the Petition Date, the number of shares outstanding totaled 23,390,962 shares.

21.     As noted in the First Day Declaration, the Debtors are experiencing a severe liquidity crisis and the DIP Credit Facility, which has the consent of SFCC and Goldman Sachs as the Company's first- and second-lien creditors, provides financing for a limited period of time. The Debtors have, therefore, determined in their business judgment that a shorter marketing period will offer the estates the best chance of preserving the Debtors' value during the sale process, saving jobs and maximizing returns to creditors.

22.     The Debtors are authorized to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

23.     No official committees has been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

## RELIEF REQUESTED

24.     The Debtors have determined that, in order for each to operate their businesses during these chapter 11 cases, the Debtors will need more cash over the next approximately thirteen weeks (or until the closing of a sale of substantially all of the Debtors' assets, which is anticipated to close within the next sixty to ninety days) than the Debtors can reasonably expect to be generated from their business operations. The Debtors have undertaken an analysis of the minimum funding necessary to maintain their business operations and has limited the amount of the postpetition loan to such amount. To obtain the use of the necessary funds, the Debtors have negotiated with the DIP Lender with respect to it providing the necessary funds in the form of the DIP Credit Facility. The Debtors and the DIP Lender have reached an agreement on the terms of the DIP Credit Facility, as set forth herein.

25.     The Debtors seek, pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of an interim and final order authorizing the Debtors to obtain postpetition financing for the following.

(i)      on an interim basis, an order authorizing the Debtors to borrow, based upon the DIP Credit Facility, $4,000,000.00 Dollars (the "Interim Order");

(ii)     setting a final hearing for approval of the Debtors to borrow, based upon the DIP Credit Facility (defined below), $4,000,000.00 Dollars (the "Final Order");

(iii)    entry of the Final Order;

(iv)    a finding that the Debtors are authorized to utilize Cash Collateral pursuant to sections 362 and 363 of the Bankruptcy Code, upon the terms and conditions set forth therein;

(v)     a finding that the Debtors are authorized to execute and enter into the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(vi)    a finding that the Debtors are authorized to use the proceeds of the DIP Credit Facility for working capital and general corporate purposes in accordance with the Budget, as that term is used and defined within the DIP Agreement;

(vii)   granting the DIP Lender a senior and second-priority priming lien on all of the Debtors' property encumbered by the prepetition liens of the Secured Creditors (defined below) pursuant to section 364(d) of the Bankruptcy Code;

(viii)  granting the DIP Lender superpriority administrative claims, as set forth in the DIP Agreement;

(ix)    modifying the automatic stay, set forth in section 362 of the Bankruptcy Code, to the extent necessary to implement and effectuate the terms of the DIP Agreement, including a waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order and the Final Order (including under Bankruptcy Rule 6004); and

(x)     related relief.

26.     The relief sought herein is the product of good faith, arms' length negotiations by and between the Debtors and the DIP Lender.  Approval of the Motion is necessary because, without the ability to borrow funds from the DIP Lender, the Debtors will lack the cash to operate their businesses during the pendency of the Cases.

11152210/2

## MATERIAL TERMS OF THE DIP CREDIT FACILITY

27.     Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Bankruptcy Rule ("Local Rule") 4001-2, the material provisions of the DIP Credit Facility, and the location of such provisions in the relevant source documents, are as follows:

| | |
|---|---|
| **Borrowers**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, p.1 | The Debtors (SGRI, SGRLLC and SGC) |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, ⁋ 1.1 | SFCC and Candy Cube |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ⁋ 1.1<br><br>Interim Order, ⁋ 2(b) | $4,000,000 on a final basis, with up to $2,500,000 on an interim basis |
| **Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, ⁋⁋ 6.10, 6.16 | The Debtors shall conduct a sale of substantially all of the assets of the Debtors in accordance with following Milestones, subject to extension as agreed upon with the consent of the Lender:<br><br>●     file the Bankruptcy Sale Motion on or before the date that is five (5) Business Days after the Petition Date;<br>●     obtain entry of the Interim Order by the Bankruptcy Court on or before the date that is seven (7) Business Days after the Petition Date;<br>●     obtain entry of the Bidding Procedures Order by the Bankruptcy Court on or before the date that is twenty-one (21) calendar days after the Petition Date;<br>●     obtain entry of the Final Order by the Bankruptcy Court on or before the date that is |

| | |
|---|---|
| | twenty-eight (28) calendar days after the Petition Date;<br>● the bid deadline set forth in the Bidding Procedures Order shall occur on or before the date that is fifty (50) calendar days after the Petition Date;<br>● if qualifying bids are received in accordance with the Bidding Procedures Order, the Debtors shall hold an auction with respect to the Bankruptcy Sale on or before the date that is fifty-five (55) calendar days after the Petition Date;<br>● the hearing on the proposed Bankruptcy Sale Order shall be held within three (3) Business Days of the closing of such auction (or if no qualifying bids are received other than from the Stalking Horse Purchaser, on or before the date that is fifty-six (56) calendar days after the Petition Date);<br>● the Debtors shall obtain entry of the Bankruptcy Sale Order authorizing the Bankruptcy Sale to the successful bidder in accordance with the Bidding Procedures Order, in each case in form and substance reasonably acceptable to SFCC on or before the date that is sixty-one (61) calendar days after the Petition Date; and<br>● the Debtors shall consummate the Bankruptcy Sale in accordance with the terms of the Bankruptcy Sale Order on or before the date that is ten (10) calendar days after the date of entry of the Bankruptcy Sale Order, with an amount equal to the Obligations (including, for the avoidance of doubt, any Lender Expenses then due) and SFCC Prepetition Debt paid directly to SFCC and Candy Cube, as applicable. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 2.3<br><br>Interim Order, ¶ 9(c) | <u>Interest Rate:</u><br>Eight percent (8%) per annum.<br><u>Default Interest Rate:</u><br>Four percent (4%) above the interest rate applicable immediately prior to the occurrence of an Event of Default. |

11152210/2

| Term/Maturity | Term: |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶¶ 1.1 and 2.3<br><br>Interim Order, ¶ 7 | The DIP Agreement shall become effective on the Closing Date and, subject to Section 12.8 of the DIP Agreement, shall continue in full force and effect for so long as any Obligations remain outstanding or the DIP Lender has any obligation to make Credit Extensions under the DIP Agreement. Notwithstanding the foregoing, the DIP Lender shall have the right to terminate its obligation to make Credit Extensions under the DIP Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default. Notwithstanding termination, the DIP Lender's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.<br><br>Maturity Date:<br>The Maturity Date is the earlier of (i) the date which is six (6) months following the Petition Date, (ii) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise (including the Bankruptcy Sale); (iii) the effective date of a plan of reorganization or liquidation in the Cases; (iv) the date of filing or support by the Debtors of a plan of reorganization that does not provide for indefeasible payment in full in cash of all obligations owing under the DIP Agreement; (v) entry of an order by the Bankruptcy Court converting the Cases to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code; (vi) entry of a final order by the Bankruptcy Court dismissing the Cases; or (vii) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loans in accordance with the terms of the DIP Agreement. |
| **Use of DIP Credit Facility; Refinancing**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c) | The Debtors shall use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Orders entered in connection with the Cases |

| | |
|---|---|
| DIP Credit Agreement, ¶ 5.18(c)<br><br>Interim Order, ¶ ¶ I, J, 4, and 15 | exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order):<br><br>    (a) to pay certain costs, premiums, fees and expenses related to the Cases (including, without limitation, with respect to the Carve Out); and<br><br>    (b) to fund working capital and other needs of the Debtors in accordance with the Budget (subject to any Permitted Budget Variance).<br><br>    (c) $600,000 shall be used for a roll-up of the prepetition obligations to repay the prepetition obligations to SFCC arising from that certain Amended and Restated Loan and Security Agreement.<br><br>Proceeds of the DIP Loan Facility or cash collateral shall <u>not</u> be used:<br><br>    (a) to permit the Debtors, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of SFCC, or (ii) the enforceability of the SFCC Prepetition Debt;<br><br>    (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action against DIP Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims;<br><br>    (c) to commence, prosecute or defend any claim or proceeding or cause of action to disallow or challenge the SFCC Prepetition Debt, any loan documents relating thereto, or any other Loan Document; or |

| | |
|---|---|
| | (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the DIP Lender, provided that a Committee and its professionals shall be permitted to investigate the liens, claims, and potential causes of action against the DIP Lender in connection with the SFCC Prepetition Debt in an amount not to exceed $10,000. |
| **Borrowing Limits**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, ¶¶ 2.1(b), 3.1 and 3.2. | Subject to and upon the terms and conditions of the DIP Credit Facility (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 3.1 and 3.2 of the DIP Agreement), The Debtors may request, and DIP Lender shall make, Advances, each in an amount necessary for the Debtors to meet the expenses set forth in the Budget for each of the prior and subsequent week to such Advance Request, not to exceed in the aggregate the DIP Loan Commitment. Each DIP Loan shall be made in an aggregate minimum amount of $250,000 and integral multiples of $250,000 in excess of that amount. Notwithstanding anything contained in the DIP Agreement to the contrary, in no event shall the DIP Lender be obligated to make DIP Loans in excess of $2,500,000 prior to the Final Order Entry Date. |
| **Borrowing Conditions**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶¶ 2.1(c), 3.1 and 3.2 | Whenever the Debtors desire an Advance of a DIP Loan (but not more frequently than twice per week), the Debtors will notify the DIP Lender by e-mail transmission or telephone no later than 12:00 p.m. Pacific time (each an "Advance Request"), (a) with respect to the initial Advance Request, two (2) Business Days, and (b) with respect to each Advance request thereafter, seven (7) Business Days (or such shorter period as agreed by the DIP Lender in its discretion) prior to the date the Advance may be made. The DIP Lender is authorized to make Advances under the DIP |

| | |
|---|---|
| | Agreement, based upon instructions received from a Responsible Officer or a designee of a Responsible Officer, or without instructions if in the DIP Lender's discretion such Advances are necessary to meet Obligations which have become due and remain unpaid. The DIP Lender shall be entitled to rely on any telephonic notice given by a person who the DIP Lender reasonably believes to be a Responsible Officer or a designee thereof, and the Debtors shall indemnify and hold the DIP Lender harmless for any damages or loss suffered by the DIP Lender as a result of such reliance the DIP Lender will wire Advances in immediately available federal funds to a deposit account identified by the Debtors in writing from time to time. |
| **Interest and Fees**<br><br>Bankruptcy Rule(c)(1)(B)<br><br>DIP Credit Agreement, ¶¶ 2.3 and 2.6<br><br>Interim Order, ¶¶ I, 14 | <u>Interest Rate</u>:<br><br>Eight percent (8%) per annum.<br><br><u>Default Interest Rate</u>:<br><br>Four percent (4%) above the interest rate applicable immediately prior to the occurrence of an Event of Default.<br><br><u>Fees</u>:<br><br>The Debtors shall pay to the DIP Lender the following:<br><br>(a) <u>Origination Fee</u>. On the Closing Date, a fully earned, non-refundable origination fee of an amount equal to two percent (2.0%) of the DIP Loan Commitments, payable out of the first Advance made under the DIP Agreement;<br><br>(b) <u>Repayment Premium</u>. On the Maturity Date (including upon any acceleration by the DIP Lender of the DIP Obligations under the DIP Agreement), the Debtors agree to pay a premium to the DIP Lender equal to (i) 1.125 times the amount of the DIP Loan |

Commitments, less (ii) the aggregate amount of (A) the fee set forth in Section 2.6(a) hereof, and (B) interest actually paid to the DIP Lender by such date in accordance with the terms of the DIP Agreement;

(c) <u>Success Fee</u>. Upon the occurrence of the Maturity Date, seven percent (7%) of the greater of (i) the aggregate amount of cash proceeds in excess of two million dollars ($2,000,000) that Goldman Sachs actually receives on account of obligations arising under the Goldman NPA (without considering any Financing Facility (as defined in the Equity Commitment Term Sheet that is attached as an exhibit to the Sale Support Agreement dated as of September 4, 2019 among SFCC, Goldman Sachs, and Candy Cube)), to the extent such proceeds result from the consummation of a Bankruptcy Sale, and (ii) if Candy Cube is the successful purchaser of the Debtors' assets, the sum of (x) the amount of any indebtedness assigned by Goldman Sachs to Candy Cube that is used by Candy Cube to credit bid, plus (y) the amount of cash proceeds in excess of two million dollars ($2,000,000) that Goldman Sachs actually receives on account of obligations arising under the Goldman Sachs Facility (without considering any Financing Proceeds (as defined in the Equity Commitment Term Sheet that is attached as an exhibit to the Sale Support Agreement dated as of September 4, 2019 among SFCC, Goldman Sachs, and Candy Cube)) (the "**Success Fee**"), to be paid by Debtors out of distributions that would have otherwise been payable to Goldman Sachs. Borrower hereby acknowledges and agrees that if the Obligations (other than inchoate indemnity obligations) are paid in full or the DIP Agreement is terminated, the obligation to pay the Success Fee hereunder shall survive and continue, and the Success Fee shall be due upon the Maturity Date. If the DIP Agreement is terminated prior to payment of the Success

| | |
|---|---|
| | Fee, DIP Lender shall continue to have such right in perpetuity, until paid; and<br><br>(d) <u>Lender Expenses</u>. On or around the Closing Date, all Lender Expenses incurred through the Closing Date and payable from the initial Advance; and after the Closing Date, all Lender Expenses as and when they become due following the delivery of an invoice to the Debtors and approval from the Bankruptcy Court. |
| **Approved Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, ¶ 6.18<br><br>Interim Order, ¶¶ 2(b), 4 | "<u>Budget</u>" means a 13-week cash flow projection and debtor-in-possession budget in form and substance reasonably acceptable to the DIP Lender; provided that, with the consent of the DIP Lender (not to be unreasonably withheld, conditioned or delayed), the budget may be updated in accordance with Section 6.18 of the DIP Agreement. A copy of the Budget is submitted at **Exhibit B** to the Proposed Interim Order in connection with this Motion.[4] Furthermore, the Budget is subject to the Permitted Budget Variances, as that defined term is used and described in Section 6.18 of the DIP Agreement. |
| **Other Covenants**<br><br>DIP Credit Agreement, Sections 6 and 7<br><br>Interim Order, ¶ 6(iii) | The DIP Agreement contains usual and customary affirmative and negative covenants. *See* <u>DIP Agreement</u>, Sections 6 and 7. |
| **Liens and Superpriority Claims** Bankruptcy Rule 4001(c)(1)(B)(i), (xi); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶¶ 4.1<br><br>Interim Order, ¶¶ 3, 3, 10.1 | <u>Liens</u>:<br><br>Effective immediately upon the entry of the Interim Order, on account of the Interim DIP Credit Facility, except with respect to the Carve-Out, the DIP Lender is granted:<br><br>(a) a valid, perfected first priority Lien on Collateral that is not subject to valid, perfected, |

---

[4]      The Budget is subject to the continued discussions among the Debtors and other parties in interest. In the event that there are any changes to the Budget, the Debtors will file a revised form of budget.

and non-avoidable Liens as of the Petition Date, including, without limitation, in Collateral acquired after the Petition Date;

(b) a valid, perfected second priority Lien on Collateral that is subject to valid, perfected, and non-avoidable Liens in favor of third parties in existence as of the Petition Date, or to valid liens in existence as of the Petition Date that are (i) perfected subsequent to such date as permitted by section 546(b) of the Bankruptcy Code and (ii) to the extent such Liens are expressly permitted in writing by the DIP Lender in its sole and absolute discretion; and

(c) a valid, perfected priming Lien (junior only the Lien of the SFCC Prepetition Debt [as defined in the DIP Agreement] and otherwise senior) in the Collateral and all existing Liens, rights, and interests granted to or for the benefit of Goldman and any other creditors of the Debtors with Liens granted on Collateral on account of funded debt.

All liens on Avoidance Actions shall be subject to entry of a final order.

Superpriority Claims:
The Debtors agree that the DIP Obligations are entitled to Superpriority Claim status in the chapter 11 cases pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expense claims, whether heretofore or hereafter incurred, of the kind specified or ordered pursuant to or in accordance with any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code.

| | |
|---|---|
| **Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶5.18<br><br>Interim Order, ¶¶ 2, 4 | Subject to the limitations set forth in Section 5.18 of the DIP Credit Agreement, the Debtors are authorized to shall use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order):<br>    ● to pay the Fees whether or not set forth in the Budget;<br>    ● to the extent not included in Section 5.18(a), to pay certain costs, premiums, fees and expenses related to the Cases (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and<br>    ● to fund working capital and other needs of the Debtors in accordance with the Budget (subject to any Permitted Budget Variance). |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv); Local Rule 4001-2(c)<br><br>Interim Order, ¶¶ F, 10, 20 | As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of the DIP Liens and the DIP Superpriority Claim, the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Prepetition Lenders are hereby granted (in each case subject only to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the following adequate protection, valid, perfected, postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens and (ii) prior payment of the Carve-Out. |
| **Carve-Out** | Subject and subordinate to the Carve-Out (as defined below) in all respects, the DIP Obligations shall constitute allowed |

| | |
|---|---|
| Local Rule 4001-2(b)(6) and (c)<br><br>Interim Order, ¶ 8 | superpriority administrative expense claims and shall have priority over all other allowed Chapter 11 and Chapter 7 administrative expense claims, including expenses of a chapter 11 and chapter 7 trustee, under sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code.<br><br>"Carve-Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code (without regard to the notice set forth in (ii) below) (the "U.S. Trustee Fees"); (ii) all reasonable fees and expenses, up to $10,000, incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Fees"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court and to the extent consistent with the Budget, all unpaid fees (including, without limitation, transaction fees paid upon the closing of the respective transaction but excluding success fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Professionals") and any Committee professionals (the "Committee Professionals" and, together with the Professionals, the "Professional Persons") employed by the Committee, if the Committee professional is appointed in the Chapter 11 Case pursuant to sections 328 or 1103 of the Bankruptcy Code at any time on or prior to delivery by or on behalf of the DIP Lender of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) the Professional Fees in an aggregate amount not to exceed $50,000 for amounts incurred after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court (the amounts set forth |

| | |
|---|---|
| | in this clause (iv) being the "<u>Post-Carve-Out Trigger Notice Cap</u>"). |
| | "<u>Carve-Out Trigger Notice</u>" means a written notice delivered by email (or other electronic means) to the Debtors and their counsel, the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an event of default under the DIP Documents, stating that the Post-Carve-Out Trigger Notice Cap has been invoked, the DIP Loans have been accelerated, and the DIP Lender does not intend to fund further advances under the DIP Loans, or consent to further use of Cash Collateral. No portion of the Carve-Out, or proceeds of the DIP Credit Facility may be used for the payment of the fees and expenses of any person incurred in challenging, or in relation to the challenge of, (i) the liens and/or claims of the DIP Lender, or the initiation or prosecution of any claim or action against the DIP Lender, including, without limitation, any claim under Chapter 5 of the Bankruptcy Code, and any other federal, state or foreign law, in respect of the DIP Documents or (ii) any claims or causes of actions against the DIP Lender under the DIP Documents, their advisors, professionals, agents and sub-agents, including formal discovery proceedings in anticipation thereof. |
| **Waivers under Sections 506(c) and 552(b) and the Equitable Doctrine of Marshaling.**<br><br>Interim Order, ¶¶ 10(ii), 22 | Subject to the entry of the Final Order, the Prepetition Lenders' consent to use of Cash Collateral and Prepetition Collateral under the Interim Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions are hereby waived. Further, any waiver of the Debtors' rights |

| | under the equitable doctrine of marshaling is subject to entry of a Final Order. |
|---|---|
| **Determination Regarding Prepetition Claim; Stipulations of the Debtors, Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)<br><br>DIP Credit Agreement, ⁋ 5.10<br><br>Interim Order, ⁋ D | The Debtors acknowledge that as of the Petition Date, they are indebted to SFCC on account of the SFCC Prepetition Debt in the outstanding principal balance of $5,000,000, plus accrued and unpaid interest and fees thereunder. The Debtors acknowledge that the Amended and Restated Loan and Security Agreement dated as of August 16, 2019 with SFCC as lender and the Debtors as borrowers (the "<u>SFCC Prepetition Loan Agreement</u>") is in full force and effect, and hereby ratifies and reaffirms all of its payment and performance obligations (including indemnification obligations) thereunder, and acknowledges that as of the Petition Date, SFCC is entitled to charge interest at the default rate set forth in the SFCC Prepetition Loan Agreement without further notice to the Debtors, and that all amounts owing thereunder are due and owing without counterclaim, defense, setoff or reduction of any kind by the Debtors. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br>Interim Order, ⁋ 19 | The releases and the Debtors' acknowledgments and stipulations shall be binding upon the Debtors upon entry of this Interim Order. In addition, such releases and stipulations shall be binding upon other party in interest, including the Committee, if any, unless a party in interest having standing, first, commences, (x) within sixty-(60) calendar days from date of the formation of a Committee for actions brought by a Creditor's Committee, or (y) seventy-five (75) calendar days following the date of entry of this Interim Order for any party other than a Committee (such time period established by clauses (x) and (y). |
| **Waiver or Modification of the Automatic Stay** | Upon five (5) Business Days' prior written notice to the Debtors, counsel approved by this |

| | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>DIP Credit Agreement, ¶ 8.14, 9.1(b)<br><br>Interim Order, ¶ 5 | Court for the Committee, and the U.S. Trustee, the DIP Lender is provided relief from any stay of proceeding (including, the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit, in an Event of Default under the DIP Agreement by the Debtors, foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $100,000 in the aggregate or (ii) permit, in an Event of Default under the DIP Agreement by the Debtors, other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole). Furthermore, the DIP Lender is hereby granted relief from the automatic stay to take steps to perfect the DIP Liens, as described below.<br><br>The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, at is discretion, file financing statements, without notice to the Debtors, with all appropriate jurisdictions to perfect or protect the DIP Lender's interest or rights under the DIP Agreement, including a notice that any disposition of the Collateral, by any of the Debtors or any other Person, shall be deemed to violate the rights of the DIP Lender under the California Uniform Commercial Code. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in the DIP Lender's discretion, and is hereby granted |

| | |
|---|---|
| | relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and any and all of such financing statements, mortgages, notices of lien and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Cases. |
| **Release, Waivers or Limitation on any Claim or Cause of Action**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii); Local Rule 4001-2(b)(3)<br><br>DIP Credit Agreement, ¶¶ 9(b)(v), 12<br><br>Interim Order, ¶¶ 17, 19 | Except as otherwise provided for in the DIP Agreement or by applicable law, the Debtors waive:<br><br>(a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the DIP Lender on which the Debtors may in any way be liable, and hereby ratifies and confirms whatever the DIP Lender may do in this regard;<br><br>(b) all rights to notice and a hearing prior to the DIP Lender's taking possession or control of, or to the DIP Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the DIP Lender to exercise any of its remedies; and<br><br>(c) the benefit of all valuation, appraisal, marshaling and exemption laws.<br><br>The Debtors waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Debtors may in any way be liable.<br>Furthermore, the Debtors waive: |

| | |
|---|---|
| | (a) any suretyship defenses available to them under the California Uniform Commercial Code or any other applicable law, including, without limitation, the benefit of California Civil Code Section 2815 permitting revocation as to future transactions and the benefit of California Civil Code Sections 1432, 2809, 2810, 2819, 2839, 2845, 2847, 2848, 2849, 2850, and 2899 and 3433; and |
| | (b) any right to require the DIP Lender to: (1) proceed against any one of the Debtors or any other person; (2) proceed against or exhaust any security; or (3) pursue any other remedy. The DIP Lender may exercise or not exercise any right or remedy it has against any of the Debtors or any security it holds (including the right to foreclose by judicial or non-judicial sale) without affecting any of the Debtors' liability. Notwithstanding any other provision of the DIP Agreement or other related document, each one of the Debtors irrevocably waive all rights that it may have at law or in equity (including, without limitation, any law subrogating the Debtors to the rights of the DIP Lender under the DIP Agreement) to seek contribution, indemnification or any other form of reimbursement from any other one of the Debtors, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by the Debtors with respect to the Obligations in connection with the DIP Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by the Debtors with respect to the Obligations in connection with the DIP Agreement or otherwise. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, Section 8 | The DIP Agreement, the Interim Order and the Final Order contain usual and customary Events of Default, including non-performance of the terms thereof. *See* <u>DIP Agreement</u>, Section 8. |

| Interim Order, ¶ 13 | |
|---|---|
| **Remedies**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, Section 9<br><br>Interim Order, ¶ 14 | (a) If the Debtors fail or neglect to perform or observe any other material term, provision, condition, covenant contained in the DIP Agreement, in any of the DIP Documents, or in any other present or future agreement between the Debtors and the DIP Lender and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within ten (10) calendar days after the Debtors receive notice thereof or any officer of the Debtors becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) calendar day period or cannot after diligent attempts by the Debtors be cured within such ten (10) calendar day period, and such default is likely to be cured within a reasonable time, then the Debtors shall have an additional reasonable period (which shall not in any case exceed twenty (20) calendar days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default but no Credit Extensions will be made.<br><br>(b) Upon the occurrence and during the continuance of an Event of Default, the DIP Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by the Debtors:<br><br>    (i) The DIP Lender may, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, this Court, suspend the DIP Loan Facility with respect to additional Advances, whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, the DIP Lender may, |

notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, this Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Loan to the Default Rate.

(ii)     The DIP Lender may, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, this Court:  (i) terminate the DIP Loan Facility with respect to further Advances;  (ii) reduce the DIP Loan Commitments from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Debtors;  or (iv) exercise any rights and remedies provided to the DIP Lender under the DIP Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to this Interim Order and the Final Order, the automatic stay of section 362 of the Bankruptcy Code shall be modified and vacated to permit the DIP Lender to exercise its remedies under the DIP Agreement and the DIP Documents, without further notice, application or motion to, hearing before, or order from, this Court, provided, however, notwithstanding anything to the contrary contained herein, that the DIP Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of the Debtors in the Collateral only upon five (5) Business Days' prior written notice to the Debtors, counsel approved by this Court for the Committee and the U.S. Trustee and as set forth in the Interim Order or Final Order (when applicable).

(iii)  Waivers by the Debtors.  Except as otherwise provided for in the DIP

| | |
|---|---|
| | Agreement or by applicable law, the Debtors waive: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the DIP Lender on which the Debtors may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to the DIP Lender's taking possession or control of, or to the DIP Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing DIP Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws. |
| | All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, automatically and without notice to the Debtors, at a rate equal to four percent (4%) above the interest rate applicable immediately prior to the occurrence of an Event of Default. Nothing included herein shall prejudice, impair, or otherwise affect the DIP Lender's right to seek any other or supplemental relief in respect of the rights of DIP Lender, as provided in the DIP Agreement or otherwise. |
| **Indemnification; Exculpation**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>DIP Credit Agreement, ¶¶ 16.11, 18<br><br>Interim Order, ¶ 14 | The Debtors shall defend, indemnify and hold harmless the DIP Lender and its officers, employees, and agents (each an "<u>Indemnified Party</u>") against:<br><br>(a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by the DIP Agreement; and |

| | (b) all losses or Lender Expenses in any way suffered, incurred, or paid by the DIP Lender as a result of or in any way arising out of, following, or consequential to transactions between the DIP Lender and the Debtors whether under the DIP Agreement, the DIP Loan Facility, the Cases, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by an Indemnified Party's gross negligence or willful misconduct. The indemnification, found in Section 12.2 of the DIP Agreement, shall not apply to Taxes. |
| | The obligations of the Debtors to indemnify the DIP Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 12.2 of the DIP Agreement shall survive until all applicable statute of limitations periods with respect to actions that may be brought against the DIP Lender have run. |

28.     Further, In the event that the Asset Purchase Agreement contemplated by the DIP Agreement is terminated by its terms and a Bankruptcy Sale Order is not entered in connection with a Bankruptcy Sale within five (5) Business Days thereafter, (b) the Debtor moves (or fails to contest in good faith a motion brought by any other Person) to approve a sale or other disposition of substantially all of the Debtor's assets without the consent of the Lender, (c) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral, which rights under Section 506(c) of the Bankruptcy Code shall be waived (subject only to and effective upon entry of the Final Order), (d) any Person attempts to apply the doctrine of marshalling with respect to the Lender, which shall be waived (subject only to and effective upon entry of the Final Order) or (e) any Person attempts to apply the "equities of the case" exception set forth in Section 552(b) of the Bankruptcy Code, which shall be waived (subject only to and effective upon entry of the Final Order).  *See* DIP Credit Agreement, ¶ 8.5.

## BASIS FOR RELIEF REQUESTED

### A.     The Bankruptcy Court May Approve Postpetition Financing

29.     Bankruptcy Code section 364(c) provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> > (1) with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

30.     Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g. In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *In re Simasko Production Co*., 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

31.     The Debtors are in need of an immediate additional infusion of liquidity to, among other things, pay employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund certain operational expenses, maintain ordinary course relationships with vendors, suppliers, and customers, and satisfy working capital needs in the

ordinary course. As of the Petition Date, the Debtors only have approximately $1,239,637.16 in cash on hand with which to operate their businesses and fund the Cases. Therefore, together with their advisors, the Debtors undertook an analysis of the incremental liquidity that would be necessary to maintain operations in connection with the filing of the Cases. Based on the Debtors' 13-week cash flow forecast, the Debtors determined that they will have additional net cash needs of approximately $3,525,000 in the first 13-weeks of the Cases.

32. The Debtors require the financing provided under the DIP Credit Facility for the operation of their businesses, to preserve their going concern value, to pay vendors, suppliers and customers, to satisfy payroll obligations, to pay for certain costs and expenses related to the Cases and to satisfy the Debtors' other working capital and operational needs. Access to sufficient working capital and liquidity made available through the DIP Credit Facility, as requested by this Motion, is vital to the preservation and maintenance of the Debtors' going concern value and to the Debtors' ultimate goal of selling substantially all of their assets, as detailed in the Sale Motion.

33. As discussed below, section 364 is satisfied because the Debtors cannot sustain operations if they cannot obtain postpetition funds by way of a debtor-in-possession loan. In order to do so, the Debtors must obtain financing from the DIP Lender, however, the only way to obtain such financing is to grant to the DIP Lender the protections provided in the Interim Order, Final Order and in the DIP Agreement.

**B.** **Authority to Grant Priming Liens and Superpriority Claims in Connection with the DIP Credit Facility Should be Provided**

34. The DIP Credit Facility requires the Debtors to provide the DIP Liens, including second-priority priming liens, and the DIP Superpriority Claims pursuant to section 364(c) and (d) of the Bankruptcy Code. Section 364(c) of the Bankruptcy Code provides, among other things, that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under

section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

35. Section 364(d) of the Bankruptcy Code, in turn, allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, after notice and a hearing, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d). As discussed below, Section 364(d) of the Bankruptcy Code is satisfied by virtue of the consent of (or lack of opposition by) all parties with an interest in the Collateral to the priming lien being granted to the DIP Lender.

36. As discussed above and in the First Day Declaration, as well as in the Declaration of Adam Meislik, despite the efforts of the Debtors and their advisors, the Debtors have been unable to (i) procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1), (b) as an administrative expense under section 364(a) or (b); or (ii) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

37. Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors commenced arm's-length negotiations with the DIP Lender regarding the DIP Credit Facility. The DIP Lender was only willing to provide the DIP Credit

Facility, if, among other things, it was granted a second-priority priming lien on the Collateral and the Superpriority Claims.

38.     Further, as indicated above, section 364(c) of the Bankruptcy Code enumerates certain incentives that a bankruptcy court may grant to postpetition lenders. Such incentives are not exhaustive. Bankruptcy courts frequently have authorized the use of inducements not specified in the statute. See e.g. *In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order that prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to postpetition lender), aff'd, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) ("[b]ankruptcy courts…have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); *In re Antico Mfg. Co.*, 31 B.R. 103 (Bankr. E.D.N.Y. 1983)(authorizing lien on prepetition collateral to secure postpetition indebtedness).

39.     Section 364 of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *L.A. Dodgers*, 457 B.R. at 313 citing *Ames Dep't Store*, 115 B.R. at 37 (noting the court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); *In*

*re Aqua Assocs.*, 123 B.R. 192, 197 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981)(section 364(d)(1)(A) of the Bankruptcy Code satisfied where two banks refused to provide unsecured credit to debtor).

40.     Furthermore, the mandates of section 364(d)(4) of the Bankruptcy Code are satisfied by virtue of the following.  First, the holder of the second priority lien on the Collateral, Goldman Sachs has specifically consented to the relief requested in the Motion.  Moreover, as discussed in greater detail in the Miller Declaration, both the holder of the third priority lien on the Collateral (Joshua Resnick) and the holder of the fourth priority lien on the Collateral (GHP Sugarfina Holdings, LLC, as Collateral agent) have affirmatively waived their rights to seek adequate protection in connection with the Collateral.  As such, the Court need not make any findings with respect to the adequate protection of said interests.

41.     In this case, substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors, working capital for the Cases was not available absent the proposed DIP Liens and DIP Superpriority Claims.  Accordingly, the Debtors believe they are required to obtain financing under sections 364(c) and (d) of the Bankruptcy Code and, accordingly, the DIP Credit Facility reflects the exercise of the Debtors' sound business judgment.  The DIP Lender was unwilling to extend financing on terms more favorable to the Debtors, and the Debtors were not able to obtain alternative sources of financing upon more favorable terms.  The Debtors' ability to continue to operate their business pending a sale pursuant to section 363 of the Bankruptcy Code and to maximize value to all stakeholders depends upon their ability to obtain the DIP Credit Facility.  Without the proposed financing, the Debtors would not have sufficient funds to operate,

jeopardizing the successful sale of substantially all of their assets, thereby diminishing recoveries for their stakeholders.

### C. The Scope of the Carve-Out Is Appropriate

42. The proposed DIP Credit Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. See *Ames Dep't Stores*, 115 B.R. at 40. Neither the Final Order nor the Interim Order directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *Id*. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). In addition, subject to the Budget, the Carve-Out ensures that proceeds of the DIP Credit Facility and Cash Collateral may be used for the payment of U.S. Trustee fees and professional fees of the Debtors and any future Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Credit Facility.

### D. The DIP Lender Is Entitled to the Protections Afforded to a Good Faith Lender Under Section 364(e)

43. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit

11152210/2

> in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

44.     In this case, the DIP Documents are the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms available on which to obtain needed postpetition financing, and (ii) are the product of extended arm's-length, good faith negotiations between and among the Debtors and the DIP Lender.  The terms and conditions of the DIP Documents are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are in the best interests of the Debtors, their estates and creditors.  The proceeds under the DIP Credit Facility will be used only for purposes that are permissible under the Bankruptcy Code, no consideration is being provided to any party to the DIP Documents other than as described herein and the DIP Lender extended the DIP Credit Facility in reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  Section 364(e) provides a lender with a presumption of good faith.  *Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC)*, 424 F.3d 963, 969 (9th Cir. 2005).  Accordingly, the Debtors request that the Court find that the DIP Lender has acted as a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

### E.     The Automatic Stay Should Be Modified on a Limited Basis

45.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.  In addition, the Final Order provides for the

modification of the automatic stay to allow for the enforcement of rights and remedies by the DIP Lender under the DIP Documents upon the occurrence of an Event of Default.

46.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

**F.     The Debtors' Proposed Use of Cash Collateral Should be Approved**

47.     As noted above, there are four (4) Secured Creditors who hold an interest in the Debtors' Cash Collateral.  In relevant part, Bankruptcy Code section 363(c)(2) provides that the Debtors "may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless – (A) each entity that has an interest in such cash collateral consents."  .

48.     Section 363(e) of the Bankruptcy Code provides that on request by an entity that has an interest in property, the court, with or without a hearing, shall prohibit or condition the use, sale, or lease of such property as necessary to provide adequate protection of such interest.  The DIP Lender has indicated that it requires adequate protection of its interests in existing collateral as a condition to its consent to such use of cash collateral, and then only on the terms reflected in this Motion and in the proposed form of Interim Order.

49.     The Debtors' business judgment as to adequate protection here is evident in the terms of the Interim Order – all of which are customary in connection with the use of collateral in operating Chapter 11 cases of this scale and consistent with the broad flexibility inherent in the concepts of adequate protection.  *See, e.g., In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) ("[a]dequate protection will take many forms, only some of which are set forth in section 361…"); *In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987) ("[t]he absence of a definition of adequate protection in the Code coupled with the 'flexibility' of Section 361(3)

suggests that adequate protection may be shown in a variety of ways"); *In re Wilson*, 30 B.R. 371, 373 (Bankr. E.D. Pa. 1983) ("[w]hile 'adequate protection' is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equity principles").

50.     The Interim Order is otherwise authorized and warranted pursuant to Section 363(c)(2) of the Bankruptcy Code given the core function of adequate protection to protect secured parties against diminution or decrease as a result of the proposed use of their collateral. *See In re Gasel Transp. Lines, Inc.*, 326 B.R. 683 (6th Cir. B.A.P. 2005).

51.     The Secured Creditors have agreed that they will consent to the Debtors' proposed use of Cash Collateral upon the granting of the Adequate Protection Liens proposed herein, and therefore, the Debtors respectfully request this Court to approve their proposed use of Cash Collateral.  For the foregoing reasons, granting the relief requested herein is appropriate and in the best interests of its estate.

### G.     The Court Should Schedule a Final Hearing on This Motion as Soon as Possible in Accordance with the Requirements of the Bankruptcy Rules

52.     By this Motion, the Debtors request that the Court schedule a final hearing on this Motion as soon as possible in accordance with the requirements of the Federal Rules of Bankruptcy Procedure.  Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure provides that the Court may commence a final hearing on this Motion no earlier than fourteen (14) days after service of the Motion.  The Debtors need to obtain as promptly as possible final authorization to obtain postpetition financing consistent with the DIP Credit Facility in order to ensure the Debtors' employees and vendors that the Debtors will be able to pay, during the course of these cases, their

ordinary operating expenses including, without limitation, payroll and the expenses of maintenance and operation of their business.

53.     Therefore, the Debtors respectfully submit that a final hearing on this Motion should be held as soon as possible after the expiration of the fourteen (14) day period provided for by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, in order to prevent the substantial damage to the Debtors' business which would result from any loss of support of the Debtors' customers, employees, and vendors.

**H.     Request for Immediate Relief and Waiver of Stay**

54.     Pending a final hearing, the Debtors require immediate financing and use of existing collateral. collateral.  The Debtors' interim request represents the Debtors' good faith projection of the cash necessary to operate during the period prior to a final hearing.  It is essential that the Debtors maintain stability and continue paying ordinary operating expenses postpetition to facilitate the sale process and maximize the value of their assets.  Absent immediate financing and use of existing collateral, the Debtors will not have any funding to pay expenses and therefore will be unable to avoid an immediate liquidation pending a final hearing.

55.     Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003(b).  The Debtors submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

56.     Bankruptcy Rule 4001 has the same standard, with respect to interim relief.  Fed. R. Bankr. P. 4001(b)(2); Fed. R. Bankr. P. 4001(c)(2) ("If the motion so requests, the court may

11152210/2

conduct a hearing before such 14-day period [after service of the motion] expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, and that Bankruptcy Rules 6003 and 4001 have been satisfied.

57.     In addition, in order to implement the foregoing successfully, the Debtors respectfully request a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the operations, value, and ability of the Debtors to reorganize.

58.     Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## **NOTICE**

59.     Notice of the Interim Hearing and notice of the Motion has been given by the Debtors to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors (excluding insiders); (ii) counsel to the DIP Lender; (iii) all known holders of liens upon the Debtors' assets; (iv) the attorneys general in the states in which the Debtors conduct their business; (v) the Internal Revenue Service; and (vi) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; by facsimile transmission, email, overnight courier and/or hand delivery.

11152210/2

60.     Further, as the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-l(m).

61.     The Debtors respectfully submit that, under the circumstances, such notice of the Interim Hearing and the Motion constitutes adequate and sufficient notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 400, and the Local Rules, and in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

62.     The Debtors have not previously sought the relief requested herein from this or any other Court.

REMAINDER OF PAGE LEFT BLANK

11152210/2

**WHEREFORE**, the Debtors respectfully request entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

DATED:  September 6, 2019
           Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman, Esquire (DE Bar No. 4159)
Brya M. Keilson, Esquire (DE Bar No. 4643)
Eric J. Monzo, Esquire (DE Bar No. 5214)
500 Delaware Avenue; Suite 1500
Wilmington, DE  19801
Tel: (302) 888-6800
Fax:  (302) 571-1750
E-mail:  JWaxman@morrisjames.com
E-mail:  BKeilson@morrisjames.com
E-mail:  EMonzo@morrisjames.com

       and

Alan J. Friedman, Esquire
Ryan O'Dea, Esquire
Shulman Hodges & Bastian
100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Tel:  (949) 427-1654
Fax:  (949) 340-3000
E-Mail:  AFriedman@shbllp.com
E-Mail: rodea@shbllp.com

*Proposed Counsel to Debtors and*
*Debtors in Possession*

11152210/2