# EXHIBIT A

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT is entered into as of September 6, 2019 (this "**Agreement**"), by and between SFCC LOAN INVESTORS, LLC, a Delaware limited liability company ("**SFCC**"), CANDY CUBE HOLDINGS, LLC ("**Candy Cube**", and together with SFCC, individually and collectively, "**Lender**"), SUGARFINA, INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Sugarfina, Inc.**"), and SUGARFINA INTERNATIONAL, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Sugarfina International**"), and SUGARFINA (CANADA), LTD., a Canadian limited company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Sugarfina Canada**", and together with Sugarfina, Inc. and Sugarfina International, individually and collectively, "**Borrower**").

### RECITALS

WHEREAS, on September 6, 2019 (the "**Petition Date**"), the Loan Parties (in such capacity, each a "**Debtor**" and collectively with each Debtor, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**" and each a "**Case**") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that the Lender make available to the Loan Parties debtor-in-possession term loans in an aggregate principal amount of up to Three Million Four Hundred Thousand Dollars ($3,400,000) (exclusive of the Roll-Up Obligations); and

WHEREAS, Lender is willing to make the Loans described herein on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Lender and Borrower agree as follows:

1.    **DEFINITIONS AND CONSTRUCTION.**

1.1    **Definitions**.  As used in this Agreement, the following terms shall have the following definitions:

"Accounts" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to Borrower arising out of the sale or lease of goods (including, without limitation, the licensing of software and other technology) or the rendering of services by Borrower, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Borrower and Borrower's Books relating to any of the foregoing.

"Advance" or "Advances" means a cash advance or cash advances under the DIP Loan Facility.

"Advance Request" has the meaning assigned in Section 2.1(c).

"Affiliate" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, and partners.

"Asset Purchase Agreement" means the asset purchase agreement filed on the Petition Date with respect to the Bankruptcy Sale, in form and substance satisfactory to the Lender.

"Avoidance Action" means any claim and cause of action that constitutes an avoidance action under Sections 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code or any other avoidance action under the Bankruptcy Code, state law or similar laws and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for Delaware or any court having jurisdiction over the Cases from time to time.

"Bankruptcy Sale" means a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all assets and other rights of Sugarfina, Inc. and its Subsidiaries to the Stalking Horse Purchaser, or to another purchaser with a higher and better bid that is accepted in accordance with the terms of the Bidding Procedures Order, on substantially the terms set forth in the Asset Purchase Agreement or such other terms acceptable to Lender (it being agreed by Candy Cube that in the event that Candy Cube is not the winning bidder, Candy Cube's consent shall be solely in its capacity as a lender hereunder and made in good faith and in the reasonable discretion of a secured lender).

"Bankruptcy Sale Motion" means a motion, in form and substance acceptable to Lender, seeking entry of the Bidding Procedures Order and the Bankruptcy Sale Order.

"Bankruptcy Sale Order" means an order of the Bankruptcy Court, in form and substance acceptable to Lender (it being agreed by Candy Cube that in the event that Candy Cube is not the winning bidder, Candy Cube's consent shall be solely in its capacity as a lender hereunder and made in good faith and in the reasonable discretion of a secured lender), approving and authorizing the Bankruptcy Sale.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in form and substance acceptable to Lender, approving (i) bidding procedures relating to the Bankruptcy Sale and procedures for assuming executory contracts and unexpired leases, (ii) authorizing the Borrower to enter into the Asset Purchase Agreement, and (iii) approving bid protections for the Stalking Horse Purchaser, in each case on terms acceptable to Lender and in all respects consistent with those terms set forth in the Asset Purchase Agreement.

"Board" means the board of directors of Sugarfina, Inc., whether acting on its own or through a duly authorized committee, including its steering committee.

"Borrower's Books" means all of Borrower's books and records including: ledgers; records concerning Borrower's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"Budget" means a 13-week cash flow projection and debtor-in-possession budget in form and substance acceptable to the Lender; provided that, with the consent of the Lender, the budget may be updated in accordance with Section 6.18, provided that in no event shall the Budget provide for the payment of any professional fees owing to Goldman or financial advisors retained by Debtors until the Obligations are paid in full.

2

"Budget Variance Report" means a report provided by the Borrower to the Lender showing by line item and in the aggregate the actual cash disbursements of the Borrower for the period set forth in Section 6.18(b), comparing the actual cash receipts and disbursements (on a line item by line item basis) with the cumulative budgeted amounts for each such line item set forth in the Budget for such period, noting therein all variances on a line-item and cumulative basis from the amounts set forth for such period in the Budget, together with explanations for all material variances, and certified as being true and correct in all material respects by the Borrower's chief financial officer, chief restructuring officer, or chief executive officer.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks in the State of California are authorized or required to close.

"Carve Out" has the meaning assigned to such term in the applicable Order.

"Case" and "Cases" have the respective meanings set forth in the recitals.

"Closing Date" means the date on which the conditions specified in Section 3.1 are satisfied.

"Code" means the California Uniform Commercial Code.

"Collateral" means the property described on **Exhibit A** attached hereto.

"Comerica Letter of Credit" means that certain letter of credit issued by Comerica Bank on account of Borrower for the benefit of CIBC Leaseco, LLC in the face amount of $215,158.95 issued on March 23, 2018.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of that Person; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lender in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"Credit Extension" means each Advance or any other extension of credit by Lender for the benefit of Borrower hereunder.

"Daily Balance" means the amount of the Obligations owed at the end of a given day.

3

18102376.4
233739-10002

"Debtor" has the meaning set forth in the recitals.

"Default" means any circumstance that, with the passage of time or giving of notice, would constitute an Event of Default.

"DIP Loan" has the meaning given to such term in Section 2.1(a) hereof.

"DIP Loan Commitments" means an aggregate amount not to exceed Four Million Dollars ($4,000,000) (inclusive of the Roll-Up Obligations), provided, however, that the DIP Loan Commitments shall mean an aggregate amount not to exceed Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000) unless the Lender consents to increase the DIP Loan Commitments to an aggregate amount not to exceed Four Million Dollars ($4,000,000). The amount of each Lender's DIP Loan Commitment is set forth on Exhibit B.

"DIP Loan Facility" means the facility under which Borrower may request Lender to issue Advances, as specified in Section 2.1 hereof.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Borrower has any interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning assigned in Section 8.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to any obligations under this Agreement pursuant to a law in effect on the date Lender acquired its interest in such obligations or on the date that Lender changes its lending office, except, in each case, to the extent that amounts with respect to such Taxes were payable to Lender immediately before the date it acquired such interest or changed its lending office, (c) Taxes that are attributable to Lender's failure to comply with Section 2.5, and (d) any U.S. federal withholding Taxes imposed under FATCA. For purposes of this definition, any reference to Lender shall be deemed to include a Foreign Lender.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to, or official interpretations implementing such, intergovernmental agreements.

"Fees" means each and all of the amounts set forth in Section 2.6.

4

"Final Order" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (or such other form acceptable to the Lender) authorizing the Loans and authorizing the Roll-Up Obligations to be deemed to constitute Obligations drawn hereunder on a dollar-for-dollar basis.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"FSHCO" has the meaning set forth on Exhibit A of this Agreement.

"GAAP" means generally accepted accounting principles as in effect from time to time.

"Goldman" means Goldman Sachs Specialty Lending Group, L.P., as successor in interest to Goldman Sachs Specialty Lending Holdings, Inc.

"Goldman NPA" means that certain Note Purchase Agreement, dated as of November 28, 2018, by and between Goldman, as purchaser, and Borrower, as issuer.

"Governmental Authority" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Guarantee" means, as to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly.

"Guarantor" is any Person providing a Guaranty in favor of Lender.

"Guaranty" is any guarantee of all or any part of the Obligations, as the same may from time to time be amended, restated, modified or otherwise supplemented.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Indebtedness" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations and (d) all Contingent Obligations.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Lender under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interim Order" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) in the form set forth as Exhibit C, with changes to such form as are satisfactory to the Lender, approving the Loan Documents and authorizing the initial DIP Loans in such amounts as are contemplated by Section 2.1(b).

5

18102376.4
233739-10002

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Insolvency Proceeding" means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"Intellectual Property" means all right, title, and interest owned by Borrower in and to the following: Copyrights, Trademarks (excluding any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office, but only until such statement is accepted by the United States Patent and Trademark Office) and Patents; trade secrets, design rights, claims for damages by way of past, present and future infringement of any of the rights included above, and all license fees and royalties arising from licenses or rights to use such intellectual property rights; all amendments, renewals and extensions of any of such Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Inventory" means all inventory in which Borrower has or acquires any interest, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of Borrower, including such inventory as is temporarily out of its custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Borrower's Books relating to any of the foregoing.

"Investment" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the United States Internal Revenue Service.

"Lender Expenses" means all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented fees and expenses of one external counsel for each Lender and local Delaware bankruptcy counsel for SFCC) of counsel for each Lender incurred in connection with the preparation, negotiation, administration, and enforcement of the Loan Documents; reasonable Collateral audit fees; and each Lender's reasonable and documented fees and expenses of one external counsel for each Lender incurred in amending, enforcing or defending the Loan Documents (including fees and expenses of appeal), incurred before, during and after an Insolvency Proceeding, whether or not suit is brought; provided, however, that Borrower shall not be required to reimburse any expenses relating to Candy Cube's capacity as the Stalking Horse Purchaser and/or as a bidder in the auction with respect to the Bankruptcy Sale; and provided further that in no event shall the aggregate amount of "Lender Expenses" for Candy Cube payable hereunder exceed $75,000.

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Loan" means the DIP Loans.

18102376.4
233739-10002

"Loan Documents" means, collectively, this Agreement, any Guaranty, any note or notes or guaranties executed by Borrower or any Guarantor, the Orders and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"Loan Party" means each of Borrower and each Secured Guarantor.

"Material Adverse Effect" means a material adverse effect on (i) the business, operations, condition (financial or otherwise), or prospects of Borrower and its Subsidiaries taken as a whole or (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents or (iii) the value of the Collateral taken as a whole or priority of Lender's security interests in the Collateral; provided that the term "Material Adverse Effect" will not be deemed to exist as a result of the Cases or the circumstances and events leading up thereto.

"Maturity Date" means the earlier of (i) the date which is six (6) months following the Petition Date, (ii) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code or otherwise (including the Bankruptcy Sale); (iii) the effective date of a plan of reorganization or liquidation in the Cases; (iv) the date of filing or support by the Borrower of a plan of reorganization that does not provide for indefeasible payment in full in cash of all obligations owing hereunder; (v) entry of an order by the Bankruptcy Court converting the Cases to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code; (vi) entry of a final order by the Bankruptcy Court dismissing the Cases; or (vii) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loans in accordance with the terms of this Agreement.

"Negotiable Collateral" means all letters of credit of which Borrower is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and Borrower's Books relating to any of the foregoing.

"Obligations" means (a) all debt, principal, interest, Fees, Lender Expenses and other amounts owed to Lender by Borrower pursuant to this Agreement or any other agreement, whether absolute or contingent, due or to become due, now existing or hereafter arising, including any interest that accrues after the commencement of an Insolvency Proceeding and including any debt, liability, or obligation owing from Borrower to others that Lender may have obtained by assignment or otherwise, and (b) the Roll-Up Obligations.

"Orders" means collectively, the Interim Order and the Final Order.

"Other Connection Taxes" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any loan hereunder or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

7

18102376.4
233739-10002

"Patents" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"Perfection Certificate" means that certain Perfection Certificate in the form provided by Lender dated the Closing Date and delivered by Borrower to Lender.

"Permitted Budget Variance" has the meaning given to it in Section 6.18.

"Permitted Discretion" means a determination made in good faith in the exercise of its commercially reasonable (from the perspective of a first priority perfected secured asset based lender) business judgment based on how an asset based lender with similar rights providing a credit facility of the type provided under this Agreement would act in similar circumstances at the time with the information then available to it.

"Permitted Indebtedness" means:

(a)     Indebtedness of (i) Borrower in favor of Lender arising under this Agreement or any other Loan Document or (ii) Borrower or a Secured Guarantor owed to a Secured Guarantor or Borrower, as the case may be;

(b)     Indebtedness existing on the Closing Date and disclosed in the Perfection Certificate (including the Roll-Up Obligations), provided that the principal amount secured thereby is not hereafter increased including, without limitation, the Comerica Letter of Credit;

(c)     Indebtedness arising in connection with the Carve Out;

(d)     Indebtedness to trade creditors incurred in the ordinary course of business;

(e)     Indebtedness in respect of a Permitted Investment;

(f)     Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business;

(g)     Guarantees of Borrower or a Secured Guarantor in respect of Indebtedness otherwise permitted hereunder of a Secured Guarantor; and

(h)     Indebtedness associated with letters of credit issued by financial institutions other than Lender, provided that (i) Lender was given the first opportunity to issue any such letter of credit and decided not to provide it (such decision not to be unreasonably conditioned, withheld or delayed, provided that it shall not be unreasonable for Lender to require any such letter of credit to be cash collateralized) and (ii) if secured, such letters of credit are secured with cash.

"Permitted Investment" means:

(a)     Investments existing on the Closing Date disclosed in the Perfection Certificate;

(b)     Investments held by Borrower or any Subsidiary in cash or (i) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, (ii) commercial paper maturing no more than one (1) year from the date of creation thereof and currently having rating of at

8

least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, (iii) certificates of deposit maturing no more than one (1) year from the date of investment therein issued by financial institutions reasonably acceptable to Lender in Lender's Permitted Discretion, and (iv) money market accounts held at financial institutions reasonably acceptable to Lender in Lender's Permitted Discretion;

(c)     Investments accepted in connection with a Transfer permitted by Section 7.1 or acquisitions permitted under Section 7.3;

(d)     [Reserved];

(e)     Investments by Borrower in Sugarfina Canada not to exceed One Hundred Fifty Thousand Dollars ($150,000) in any fiscal year;

(f)     Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of Borrower's business;

(g)     Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the ordinary course of business, provided that this subparagraph (h) shall not apply to Investments of Borrower in any Subsidiary; and

(h)     [Reserved].

"Permitted Liens" means the following:

(a)     Any Liens existing on the Closing Date and disclosed in the Perfection Certificate, provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien, including, without limitation, (i) the Lien in favor of Comerica Bank on cash collateral securing the Comerica Letter of Credit, and (ii) any Lien securing Prepetition Indebtedness (including the Roll-Up Obligations);

(b)     Any Liens arising under this Agreement or the other Loan Documents;

(c)     Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings, provided the same have no priority over any of Lender's security interests;

(d)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than thirty (30) calendar days or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, or letters of credit or guarantees issued in respect thereof, other than any Lien imposed by ERISA;

(f)     any interest or title of a lessor under any lease entered into by Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased and statutory and common law landlords' liens under leases to which Borrower is a party, provided that such landlord has executed a landlord waiver in form and substance acceptable to Lender in its Permitted Discretion;

9

18102376.4
233739-10002

      (g)     Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.8 (judgments/settlements);

      (h)     the filing of UCC financing statements solely as a precautionary measure in connection with operating leases and consignment arrangements;

      (i)     Subject to Section 6.9, Liens in favor of other financial institutions arising in connection with Borrower's deposit accounts held at such institutions to secured standard fees for deposit services charged by, but not financing made available by such institutions, provided that Lender has a perfected security interest in the amounts held in such deposit accounts;

      (j)     Liens on cash securing letters of credit constituting Indebtedness permitted pursuant to clause (i) of the definition of Permitted Indebtedness;

      (k)     Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (j) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase; and

      (l)     to the extent constituting a Lien, the Carve Out.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"**Petition Date**" has the meaning set forth in the recitals.

"**Prepetition Indebtedness**" means the Indebtedness of Borrower existing as of the Petition Date pursuant to (a) that certain Amended and Restated Loan and Security Agreement, dated as of August 16, 2019, by and among SFCC, Sugarfina, Inc., and Sugarfina International, as the same may be amended, supplemented and/or otherwise modified from time to time (the "**SFCC Prepetition Debt**"), (b) the Goldman NPA, as the same may be amended, supplemented and/or otherwise modified from time to time, (c) that certain Revolving Promissory Note, dated as of August 19, 2016, by Sugarfina, Inc. in favor of Joshua Resnick, as the same may be amended, supplemented and/or otherwise modified from time to time, (d) that certain Amended and Restated Note Purchase Agreement, dated as of June 24, 2019, by and between Sugarfina, Inc. and various investors, and (e) those certain Unsecured Convertible Promissory Notes issued by Sugarfina, Inc. in October 2018 to various investors.

"**Prepetition Loan Documentation**" means the documentation governing any (or all) of the Prepetition Indebtedness.

"**Responsible Officer**" means each of the Chief Executive Officers, the Chief Financial Officer and the Chief Restructuring Officer of Borrower.

"**Roll-Up Obligations**" means the principal sum of $600,000 advanced to Sugarfina, Inc. by SFCC on or about August 26, 2019 in accordance with and pursuant to that certain Amended and Restated Loan and Security Agreement dated as of August 16, 2019 among Sugarfina, Inc., Sugarfina International, LLC and SFCC.

"**Secured Guarantor**" is any Guarantor who has (a) executed and delivered to Lender a Guaranty in form and substance satisfactory to Lender pursuant to which such Guarantor has granted Lender

18102376.4
233739-10002

a first priority perfected Lien in the types of assets substantially similar to the Collateral to secure the Obligations and (b) provided to Lender all other documentation in form and substance satisfactory to Lender which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above and which Lender has reasonably requested.

"SFCC" means SFCC Loan Investors, LLC, a Delaware limited liability company (as successor in interest to Avidbank).

"SFCC Prepetition Debt" has the meaning assigned in clause (a) of the definition of "Prepetition Indebtedness".

"Stalking Horse Purchaser" means Candy Cube Holdings, LLC, a Delaware limited liability company, or its designated affiliate, appointed as the stalking horse purchaser with respect to the Bankruptcy Sale.

"Subsidiary" means any corporation, company or partnership in which (i) any general partnership interest or (ii) more than 50% of the stock or other units of ownership which by the terms thereof has the ordinary voting power to elect the Board, managers or trustees of the entity, at the time as of which any determination is being made, is owned by Borrower, either directly or through an Affiliate.

"Success Fee" is defined in Section 2.6(c).

"Superpriority Claim" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Debtors (other than superpriority claims granted to the Stalking Horse Purchaser under the Asset Purchase Agreement), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

"Tax" or "Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

"U.S. Trustee" means the United States Trustee for the District of Delaware.

"US Withholding Tax Form" means whichever of the following that is relevant (including, in each case, any successor form):

(a)     IRS Form W-8BEN or W-8BEN-E,

(b)     IRS Form W-8IMY (with appropriate attachments),

(c)     IRS Form W-8ECI,

(d)     IRS Form W-8EXP,

11

(e)    In the case of a Foreign Lender relying on the "portfolio interest exemption," IRS Form W-8BEN or W-8BEN-E and a certificate to the effect that such Foreign Lender is not (1) a "bank" within the meaning of IRC section 881(c)(3)(A), (2) a "10 percent shareholder" of Borrower within the meaning of IRC section 881(c)(3)(B), or (3) a "controlled foreign corporation" described in IRC section 881(c)(3)(C), or

(f)    any other IRS form by which a person may claim complete exemption from, or reduction in the rate of, withholding (including backup withholding) of US federal income tax on interest and other payments to that person.

"W&P Design Licensing Agreement" means that certain Exclusive License Agreement dated May 4, 2017 between Borrower and Assembly Brands LLC (d/b/a W&P Design), a New York limited liability company.

**1.2    Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with GAAP and all calculations made hereunder shall be made in accordance with GAAP. When used herein, the terms "financial statements" shall include the notes and schedules thereto.

**2.    LOAN AND TERMS OF PAYMENT.**

**2.1    Credit Extensions.**  Borrower promises to pay to the order of Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to Borrower hereunder. Borrower shall also pay interest on the unpaid principal amount of such Credit Extensions at rates in accordance with the terms hereof.

(a)    **Term Loan.** Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 3.1 and 3.2), each Lender agrees severally that it will make from time-to-time Advances in an amount not to exceed its DIP Loan Commitment (each, a "**DIP Loan**"). Amounts borrowed under this Section 2.1(a) may not be reborrowed once repaid.

(b)    Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 3.1 and 3.2), Borrower may request, and Lender shall make, Advances, each in an amount necessary for the Borrower to meet the expenses set forth in the Budget for each of the prior and subsequent week to such Advance Request, not to exceed in the aggregate the DIP Loan Commitment. Each DIP Loan shall be made in an aggregate minimum amount of $250,000 and integral multiples of $250,000 in excess of that amount. Notwithstanding anything contained herein to the contrary, in no event shall the Lender be obligated to make DIP Loans in excess of $2,500,000 (excluding the Roll-Up Obligations) prior to the Final Order Entry Date.

(c)    Whenever Borrower desires an Advance of a DIP Loan, but no more frequently than twice per calendar week, Borrower will notify Lender by e-mail transmission or telephone no later than 12:00 p.m. Pacific time (each an "**Advance Request**"), (1) with respect to the initial Advance Request, two (2) Business Days, and (2) with respect to each Advance request thereafter, seven (7) Business Days (or such shorter period as agreed by Lender in its discretion) prior to the date the Advance may be made. Lender is authorized to make Advances under this Agreement, based upon instructions received from a Responsible Officer or a designee of a Responsible Officer, or without instructions if in Lender's discretion such Advances are necessary to meet Obligations which have become due and remain unpaid. Lender shall be entitled to rely on any telephonic notice given by a person who Lender reasonably believes to be a Responsible Officer or a designee thereof, and Borrower shall indemnify and hold Lender harmless for any

12

damages or loss suffered by Lender as a result of such reliance. Lender will wire Advances in immediately available federal funds to a deposit account identified by the Borrower in writing from time to time.

(d)    All Advances under this Section 2.1 and all accrued and unpaid interest thereon shall be repaid in full by Borrower on the Maturity Date.

**2.2    [Reserved].**

**2.3    Interest Rates, Payments, and Calculations.**

(a)    **Interest Rates.** Except as set forth in Section 2.3(b) and subject to Section 2.3(c), the Advances shall bear interest, on the outstanding Daily Balance thereof, at a rate equal to eight percent (8%) per annum.

(b)    **Default Rate.** All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, automatically and without notice to Borrower, at a rate equal to four percent (4%) above the interest rate applicable immediately prior to the occurrence of an Event of Default.

(c)    **Payments.** Interest hereunder shall be due and payable on the Maturity Date.

(d)    **Computation.** All interest chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty-five (365) day year for the actual number of days elapsed.

**2.4    Crediting Payments.** Prior to the occurrence of an Event of Default, Lender shall credit a wire transfer of funds, check or other item of payment to the Obligations, first to unpaid Lender Expenses, then to any unpaid fees, then to accrued and unpaid interest, and lastly to the outstanding principal balance. After the occurrence of an Event of Default, the receipt by Lender of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such payment is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment. Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 12:00 p.m. Pacific Time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day. Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

**2.5    Withholding.**

(a)    Payments received by Lender from Borrower under this Agreement will be made free and clear of and without deduction for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of Borrower) requires Borrower to make any withholding or deduction of any Tax from any such payment, then Borrower shall be entitled to make such deduction or withholding and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required.

13

(b)    Borrower shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law and Borrower will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that Borrower has made such withholding payment.

(c)    Notwithstanding anything to the contrary in this Section 2.5, Borrower need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings and as to which payment in full is bonded or reserved against by Borrower. The agreements and obligations of Borrower contained in this Section shall survive the termination of this Agreement.

(d)    Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(e)    If Lender determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made by Borrower under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that Borrower, upon the request of Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant taxing authority) to Lender in the event Lender is required to repay such refund to such taxing authority.

(f)    If any assignee of Lender's rights hereunder is not a "United States Person" as defined in IRC Section 7701(a)(30) (such assignee, a **"Foreign Lender"**), such Foreign Lender shall, upon becoming party to this Agreement, to the extent that such Foreign Lender is entitled to a reduced rate of U.S. withholding tax or an exemption from U.S. withholding tax on interest, deliver to Borrower a complete and properly executed US Withholding Tax Form, certifying that such Foreign Lender is entitled to such reduced rate or exemption from U.S. withholding tax on interest and Lender, Borrower and such Foreign Lender shall cooperate in good faith to establish a register meeting the requirements of applicable law. Notwithstanding anything to the contrary in this section 2.5, Borrower shall not be required to pay any additional amount to any Foreign Lender under Section 2.5 if such Foreign Lender fails or is unable to deliver the forms, certificates or other evidence described in the preceding sentence, unless such Foreign Lender's failure or inability to deliver such forms is the result of any change in any applicable law, treaty or governmental rule, or any change in the interpretation thereof after such Foreign Lender became a party to this Agreement; provided, further, that if a payment made to a Foreign Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Foreign Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in IRC sections 1471(b) or 1472(b), as applicable), such Foreign Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by IRC section 1471(b)(3)(C)(i)) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with its obligations under FATCA and to determine that such Foreign Lender has complied with such Foreign Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this provision, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

**2.6**    **Fees**. Borrower shall pay to Lender the following:

18102376.4
233739-10002

(a)    **Origination Fee**. On the Maturity Date (including upon any acceleration by the Lender of the Obligations hereunder), a fully earned, non-refundable origination fee of an amount equal to two percent (2.0%) of the DIP Loan Commitments.

(b)    **Repayment Premium**. On the scheduled Maturity Date (or upon any acceleration by the Lender of the Obligations hereunder as a result of a breach of one or more of Sections 6.4, 6.7, 6.9, 6.10, 6.16, 6.18, 6.19, 6.20, 7.1, 7.4-7.9, 8.1, 8.2, 8.3, 8.5, 8.7, or 8.11-8.18 hereof), Borrower agrees to pay a premium to Lender equal to (i) 1.125 times the amount of the DIP Loan Commitments, *less* (ii) the aggregate amount of (A) the fee set forth in Section 2.6(a) hereof, and (B) interest actually paid to Lender (other than interest paid on account of an Event of Default in accordance with Section 2.3(b)) by such date in accordance with the terms of this Agreement.

(c)    **Success Fee**. Upon the occurrence of the Maturity Date, a success fee equal to seven percent (7%) of the greater of (i) the aggregate amount of cash proceeds in excess of two million dollars ($2,000,000) that Goldman actually receives on account of obligations arising under the Goldman NPA (without considering any Financing Proceeds (as defined in the Equity Commitment Term Sheet that is attached as an exhibit to the Sale Support Agreement dated as of September 6, 2019 among SFCC, Goldman, and Candy Cube)), to the extent such proceeds result from the consummation of a Bankruptcy Sale, and (ii) if Candy Cube is the successful purchaser of the Debtors' assets, the sum of (x) the amount of any indebtedness assigned by Goldman to Candy Cube that is used by Candy Cube to credit bid, plus (y) the amount of cash proceeds in excess of two million dollars ($2,000,000) that Goldman actually receives on account of obligations arising under the Goldman NPA (without considering any Financing Proceeds (as defined in the Equity Commitment Term Sheet that is attached as an exhibit to the Sale Support Agreement dated as of September 6, 2019 among SFCC, Goldman, and Candy Cube)) (the "**Success Fee**"), to be paid by Debtors out of distributions that would have otherwise been payable to Goldman. Borrower hereby acknowledges and agrees that if the Obligations (other than inchoate indemnity obligations) are paid in full or this Agreement is terminated, the obligation to pay the Success Fee hereunder shall survive and continue, and the Success Fee shall be due upon the Maturity Date. If this Agreement is terminated prior to payment of the Success Fee, Lender shall continue to have such right in perpetuity, until paid; and

(d)    **Lender Expenses.** Following the delivery of an invoice to Borrower (but not more frequently than once per calendar month), all accrued and unpaid Lender Expenses, which shall be paid on an interim basis as and when they become due.

**2.7    Term**. This Agreement shall become effective on the Closing Date and, subject to Section 12.8, shall continue in full force and effect for so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions under this Agreement.    Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Credit Extensions under this Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default. Notwithstanding termination, Lender's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.

**2.8    Right to Credit Bid**. Subject to the Orders, in connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, Borrower and each other Loan Party hereby gives Lender the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations allocated to such Lender in order to purchase (either directly or through one or

15

more acquisition vehicles) all or any portion of the Collateral; provided that SFCC agrees that it will only "credit bid" in a sale if the Asset Purchase Agreement has been terminated pursuant to its terms.

3.    **CONDITIONS OF LOANS.**

      3.1    **Conditions Precedent to Initial Credit Extension**. The obligation of Lender to make the initial Credit Extension is subject to the satisfaction of the following conditions precedent:

          (a)    Lender shall have received, in form and substance satisfactory to Lender, the following:

               (i)    executed copies of this Agreement and the other Loan Documents;

               (ii)    evidence satisfactory to Lender that the insurance policies required by Section 6.8 hereof are in full force and effect;

               (iii)    [Reserved];

               (iv)    true, accurate and complete copies of all documents evidencing any the Prepetition Indebtedness in existence as of the Closing Date;

               (v)    the initial Advance Request;

               (vi)    the Perfection Certificate;

               (vii)    a consent from Goldman relating to the execution, delivery and performance of this Agreement by the Loan Parties in substantially the form of Exhibit D attached hereto; and

               (viii)    such other documents, and completion of such other matters, as Lender may reasonably deem necessary or appropriate;

          (b)    the Loan Parties shall have delivered to Lender the initial Budget, which Budget shall be in form and substance satisfactory to Lender;

          (c)    the Interim Order Entry Date shall have occurred not later than five (5) Business Days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay;

          (d)    the Petition Date shall have occurred and each Loan Party shall be a debtor and debtor-in-possession in the Cases; and

          (e)    the "first day orders" sought by the Borrower shall be reasonably satisfactory in form and substance to the Lender.

      3.2    **Conditions Precedent to all Credit Extensions**. The obligation of Lender to make each Credit Extension, including the initial Credit Extension, is further subject to the following conditions:

          (a)    the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of Borrower's request for a Credit Extension and on the

16

effective date of each Credit Extension as though made at and as of each such date.  The making of each Credit Extension shall be deemed to be a representation and warranty by Borrower on the date of such Credit Extension as to the accuracy of the facts referred to in this Section 3.2;

(b)    no Default or Event of Default shall be continuing or would exist after giving effect to such Credit Extension;

(c)    the Cases of any of the Debtors shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(d)    no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases; and

(e)    for each Credit Extension made after the Final Order has been entered by the Bankruptcy Court, the Final Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay.

**4.    CREATION OF SECURITY INTEREST.**

**4.1    Grant of Security Interest**.  To secure prompt repayment of any and all Obligations and prompt performance by Borrower of each of its covenants and duties under the Loan Documents, Borrower grants Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral (subject to Permitted Liens as set forth herein).  Such security interest shall constitute:

(a)    a valid, perfected first priority Lien on Collateral that is not subject to valid, perfected, and non-avoidable Liens as of the Petition Date, including, without limitation, in Collateral acquired after the Petition Date;

(b)    a valid, perfected second priority Lien on Collateral that is subject to valid, perfected, and non-avoidable Liens in favor of third parties in existence as of the Petition Date, or to valid liens in existence as of the Petition Date that are (i) perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code and (ii) to the extent such Liens are expressly permitted in writing by the Lender in its sole and absolute discretion; and

(c)    a valid, perfected priming Lien (junior only to the Lien of the SFCC Prepetition Debt and otherwise senior) in the Collateral and all existing Liens, rights, and interests granted to or for the benefit of Goldman and any other creditors of the Borrower with Liens granted on Collateral on account of funded debt.

The Debtors agree that the Obligations are entitled to Superpriority Claim status in the chapter 11 cases pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expense claims, whether heretofore or hereafter incurred, of the kind specified or ordered pursuant to or in accordance with any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code.

**4.2    Delivery of Additional Documentation Required**.  Borrower shall from time to time execute and deliver to Lender, at the request of Lender, all Negotiable Collateral, all financing statements and other documents that Lender may reasonably request, in form satisfactory to Lender, to

18102376.4
233739-10002

perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents. Borrower from time to time may deposit with Lender specific time deposit accounts to secure specific Obligations. Borrower authorizes Lender to hold such balances in pledge and to decline to honor any drafts thereon or any request by Borrower or any other Person to pay or otherwise transfer any part of such balances for so long as the Obligations are outstanding.

**4.3    Authorization to File Financing Statements**. Borrower hereby authorizes Lender to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Lender under the Code. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

**4.4    Security Interest in Collateral located in Mexico**. To secure prompt repayment of any and all Obligations and prompt performance by Borrower of each of its covenants and duties under the Loan Documents, promptly (under the circumstances) after Lender's request, Borrower shall execute and deliver to Lender any documents required under the laws and regulations of Mexico to (a) grant Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral located in Mexico or subject to the laws and regulations of Mexico and to (b) to perfect and continue the perfection of such security interest. Borrower hereby authorizes Lender to file any required documents under this Section 4.4, without notice to Borrower, with all appropriate jurisdictions in Mexico to perfect or protect Lender's interest or rights hereunder, in form and substance that is in accordance with the laws and regulations of Mexico. The costs and expenses associated with Debtors' compliance with this Section 4.4 shall be excluded from the Budget.

**5.    REPRESENTATIONS AND WARRANTIES.**

Each Borrower represents and warrants as follows:

**5.1    Due Organization and Qualification**. Borrower and each Subsidiary is a corporation duly existing under the laws of its state of incorporation and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except in each case (other than with respect to their states of incorporation) where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.

**5.2    Due Authorization; No Conflict**. Subject to the entry of the Orders and the terms hereof, the execution, delivery, and performance of the Loan Documents are within Borrower's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in Borrower's Certificate of Incorporation or Bylaws, nor will they constitute an event of default under any material agreement to which Borrower is a party or by which Borrower is bound. Borrower is not in default under any agreement to which it is a party or by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3    No Prior Encumbrances**. Borrower has good and marketable title to its property, free and clear of Liens, except for Permitted Liens.

**5.4    Bona Fide Accounts**. The Accounts are bona fide existing obligations. The property and services giving rise to such Accounts has been delivered or rendered to the account debtor or to the account debtor's agent for immediate and unconditional acceptance by the account debtor.

18

18102376.4
233739-10002

**5.5** **Merchantable Inventory.** All Inventory is in all material respects of good and (subject to the entry of the Orders and the terms hereof) marketable quality, free from all material defects, except for Inventory (i) that is damaged or becomes obsolete in the ordinary course of business or (ii) for which adequate reserves have been made.

**5.6** **Intellectual Property.** Borrower is the sole owner of the Intellectual Property, except for (a) licenses granted by Borrower in the ordinary course of business (including the W&P Design Licensing Agreement), (b) licenses that could not result in a legal transfer of title of the licensed property but that may be exclusive in respects other than territory, and (c) licenses relating to discreet geographical areas outside of the United States. For the avoidance of doubt and for sake of clarity, however, Borrower may enter into limited non-competition arrangements with its licensees and similar business partners in the ordinary course of business. Each of the Patents is valid and enforceable, and no part of the Intellectual Property has been judged invalid or unenforceable, in whole or in part, and no claim has been made that any part of the Intellectual Property violates the rights of any third party (except to the extent such claim could not reasonably be expected to cause a Material Adverse Effect).

**5.7** **Name; Location of Chief Executive Office.** Except as disclosed in the Perfection Certificate, Borrower has not done business under any name other than that specified on the signature page hereof. The chief executive office of Borrower is located at the address indicated in the Perfection Certificate. Except as disclosed in writing to Lender, all of Borrower's Inventory and Equipment is located only at the locations set forth in the Perfection Certificate.

**5.8** **Litigation.** Except as disclosed in writing to Lender or as set forth in the Perfection Certificate, there are no actions or proceedings (other than the Cases) pending by or against Borrower or any Subsidiary before any court or administrative agency in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

**5.9** **No Material Adverse Change in Financial Statements.** All consolidated and consolidating financial statements related to Borrower and any Subsidiary that Lender has received from Borrower fairly present in all material respects Borrower's financial condition as of the date thereof and Borrower's consolidated and consolidating results of operations for the period then ended and have been prepared in accordance with GAAP. There has not been a material adverse change in the consolidated or the consolidating financial condition of Borrower since the date of the most recent of such financial statements submitted to Lender (other than as a result of the Cases or the circumstances and events leading up thereto).

**5.10** **SFCC Prepetition Debt.** Debtors acknowledge that as of the Petition Date, the Debtors are indebted to SFCC on account of the SFCC Prepetition Debt in the outstanding principal balance of $5,000,000, plus accrued and unpaid interest and fees thereunder, which amount would be reduced to $4,400,000 (plus accrued and unpaid interest and fees thereunder) if the Bankruptcy Court approves the Roll-Up Obligations in the Final Order. Debtors acknowledge that the Amended and Restated Loan and Security Agreement dated as of August 16, 2019 with SFCC as lender and Debtors as borrowers (the "**SFCC Prepetition Loan Agreement**") is in full force and effect, and hereby ratify and reaffirm all of their payment and performance obligations (including indemnification obligations) thereunder, and acknowledge that as of the Petition Date, SFCC is entitled to charge interest at the default rate set forth in the SFCC Prepetition Loan Agreement without further notice to Debtors, and that all amounts owing thereunder are due and owing without counterclaim, defense, setoff or reduction of any kind by Debtors.

**5.11** **Regulatory Compliance.** Borrower and each Subsidiary have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from Borrower's failure to comply with ERISA that is reasonably likely to result in

19

Borrower's incurring any liability that could reasonably be expected to have a Material Adverse Effect. Borrower is not required to be registered as an "investment company" under the Investment Company Act of 1940. Borrower is not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System). Borrower and each Subsidiary have complied with all the provisions of the Federal Fair Labor Standards Act except in each case where the failure to do so could not reasonably be expected to cause a Material Adverse Effect. Borrower and each Subsidiary have not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could reasonably be expected to cause a Material Adverse Effect.

       **5.12**    **Environmental Condition.** Except as would not reasonably be expected to have a Material Adverse Effect, none of Borrower's or any Subsidiary's properties or assets has ever been used by Borrower or any Subsidiary or, to the best of Borrower's knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law; to the best of Borrower's knowledge, none of Borrower's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute; no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by Borrower or any Subsidiary; and neither Borrower nor any Subsidiary has received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal, state or other governmental agency concerning any action or omission by Borrower or any Subsidiary resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

       **5.13**    **Taxes.** Borrower and each Subsidiary have filed or caused to be filed all material tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein, except (i) for taxes that are being contested in good faith by appropriate proceedings and are reserved against (to the extent required by GAAP) by Borrower, or (ii) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

       **5.14**    **Subsidiaries.** Borrower does not own any stock, partnership interest or other equity securities of any Person, except for Permitted Investments.

       **5.15**    **Government Consents.** Borrower and each Subsidiary have obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of Borrower's business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

       **5.16**    **Deposit and Securities Accounts.** Borrower and each Subsidiary maintains deposit or securities accounts only as set forth in the Perfection Certificate.

       **5.17**    **Full Disclosure.** No representation, warranty or other statement made by Borrower in any certificate or written statement furnished to Lender taken together with all such certificates and written statements and supplements furnished to Lender contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading when made, it being recognized by Lender that the projections and forecasts provided by Borrower in good faith and based upon assumptions that were reasonable at the time such projections were delivered and are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results. No Loan Document has been amended except as set forth in the schedule to the Assignment Agreement.

20

18102376.4
233739-10002

The Loan Documents (including all documents assigned by Avidbank to SFCC pursuant to the Assignment Agreement) are each in full force and effect and are not subject to any offset, claim, counterclaim or defense in favor of Borrower.

      **5.18**    **Use of Proceeds.** The Borrower shall use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order):

           (a)    to pay the Fees whether or not set forth in the Budget;

           (b)    to the extent not included in Section 5.18(a), to pay certain costs, premiums, fees and expenses related to the Cases (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and

           (c)    to fund working capital and other needs of the Debtors in accordance with the Budget (subject to any Permitted Budget Variance).

Proceeds of the DIP Loan Facility or cash collateral shall not be used (a) by the Debtors, or any other party-in-interest, including a Committee, or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine (i) the validity, perfection, enforceability or priority of claims or security interests in favor of Lender, or (ii) the validity, perfection, enforceability of the SFCC Prepetition Debt, (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action of any kind or nature against Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to commence, prosecute or defend any claim or proceeding or cause of action of any kind or nature to disallow or challenge the SFCC Prepetition Debt, any loan documents relating thereto, or any other Loan Document, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the Lender, provided that a Committee and its professionals shall be permitted to investigate the liens, claims, and potential causes of action against the Lender in connection with the SFCC Prepetition Debt in an amount not to exceed $10,000 and any amount spent in excess of such amount shall not constitute administrative expenses of the Cases and shall be automatically disallowed. Notwithstanding the foregoing, nothing herein shall prohibit the Debtors from disputing the alleged occurrence of a default or Event of Default hereunder.

      **5.19**    **Financial Information.** (a) On and as of the Closing Date, the Budget, copies of which have heretofore been furnished to the Lender and (b) following the Closing Date, any updated Budget delivered pursuant to Section 6.18, in each case, are based on good faith estimates and assumptions made at such time by the persons who prepared it.

      **5.20**    **Cases.** The Cases were commenced on the Petition Date in accordance with applicable law, and notice of the hearing for the approval of the Interim Order has been given as identified in the certificate of service filed with the Bankruptcy Court.

      **5.21**    **Orders.** The Interim Order and, after it has been entered, the Final Order are in full force and effect, and have not, in whole or in material part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction, and the Borrower is in material compliance with each Order.

18102376.4
233739-10002

6.    **AFFIRMATIVE COVENANTS.**

Each Borrower shall do all of the following:

      6.1    **Good Standing**.    Borrower shall maintain its and each of its Subsidiaries' corporate existence and good standing in its jurisdiction of incorporation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect.  Borrower shall maintain, and shall cause each of its Subsidiaries to maintain, in force all licenses, approvals and agreements, the loss of which could have a Material Adverse Effect.

      6.2    **Government Compliance**.    Borrower shall meet, and shall cause each Subsidiary to meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA.  Borrower shall comply, and shall cause each Subsidiary to comply, with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

      6.3    **Financial Statements, Reports, Certificates**.    Borrower shall deliver the following to Lender:

      (a)    every Friday, a cash flow forecast in form and detail satisfactory to Lender, covering all of the weeks through the Maturity Date; and (ii) every Friday, aged listings of accounts receivable and accounts payable, accompanied by a report of Borrower's Inventory;

      (b)    as soon as available, but in any event within twenty (20) calendar days after the end of each fiscal month, a Borrower prepared consolidated balance sheet, income, and cash flow statement covering Borrower's consolidated operations during such period, prepared in accordance with GAAP, consistently applied, in a form acceptable to Lender;

      (c)    copies of all statements, reports and notices sent or made available generally by Borrower to its security holders or to any holders of Prepetition Indebtedness and, if applicable, all reports on Forms 10-K and 10-Q filed with the Securities and Exchange Commission;

      (d)    (i) together with the reports described in clause (e) below, a report of any legal actions (other than claims asserted in the Cases) for worker's compensation, unemployment or counter-claims in intellectual property infringement proceedings which are pending or threatened in writing against Borrower or any Subsidiary that could reasonably be expected to result in a Material Adverse Effect; and (ii) promptly upon receipt of notice thereof, a report of (x) any other legal actions (other than the Cases) pending or threatened in writing against Borrower or any Subsidiary that could reasonably be expected to result in liability to Borrower or any Subsidiary of One Hundred Thousand Dollars ($100,000) or more, or (y) any commercial tort claim acquired by Borrower;

      (e)    commencing with the month ending September 30, 2019, within thirty (30) calendar days of the last day of each month, a report signed by Borrower, in form acceptable to Lender in its Permitted Discretion, listing any applications or registrations that Borrower has made or filed in respect of any Patents, Copyrights or Trademarks and the status of any outstanding applications or registrations, as well as any material change in Borrower's Intellectual Property along with an updated Perfection Certificate if any of the information contained in the Perfection Certificate delivered to the Lender on the Closing Date is no longer true and correct in all respects;

      (f)    within fifteen (15) calendar days after the last day of each month, copies of bank statements for all bank accounts;

18102376.4
233739-10002

(g)     written notice within five (5) Business Days' of the resignation from or termination of employment of any Responsible Officer;

(h)     commencing on the date that is five (5) Business Days after the Petition Date, and thereafter on a weekly basis, on or before 11:59 p.m. Pacific time each Friday, a Budget Variance Report certified by a Responsible Officer, and any updates to the Budget that are approved by Lender in Lender's sole discretion; and

(i)     such other financial information as Lender may request from time to time in its Permitted Discretion.

To the extent any of the foregoing reports or financial information are due on a day that is not a Business Day, Borrower shall instead deliver such reports or financial information on the next Business Day.

**6.4     Right to Inspect.** Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrower's usual business hours and at Borrower's sole cost and expense, to inspect Borrower's Books and to make copies thereof, to audit Borrower's Accounts and to check, test, and appraise the Collateral in order to verify Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral; provided that no notice is required if an Event of Default has occurred and is continuing.

**6.5     Inventory; Returns.** Borrower shall keep all Inventory in good and marketable condition, free from all material defects except for Inventory for which adequate reserves have been made. Returns and allowances, if any, as between Borrower and its account debtors shall be on the same basis and in accordance with the usual customary practices of Borrower, as they exist at the time of the execution and delivery of this Agreement. Borrower shall promptly notify Lender of all returns and recoveries and of all disputes and claims, where the return, recovery, dispute or claim involves more than One Hundred Thousand Dollars ($100,000).

**6.6     Taxes.** Borrower shall make, and shall cause each Subsidiary to make, due and timely payment or deposit of all material Taxes required of it by law, provided that Borrower or a Subsidiary need not make any payment if (i) the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrower and (ii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.7     Formation or Acquisition of Subsidiaries.** Notwithstanding and without limiting the negative covenants contained in Sections 7.3 and 7.7 hereof, but subject to 4.3 hereof, within three (3) calendar days after the formation by Borrower of any direct or indirect domestic Subsidiary or acquires any direct or indirect domestic Subsidiary, Borrower shall (a) cause such Subsidiary to provide to Lender a joinder to this Agreement to cause such Subsidiary to become a co-borrower hereunder, together with such appropriate financing statements, all in form and substance satisfactory to Lender (including being sufficient to grant Lender a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Lender appropriate certificates and powers and financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Lender, and (c) provide to Lender all other documentation in form and substance satisfactory to Lender that in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above.

23

18102376.4
233739-10002

6.8    **Insurance.**

(a)    Borrower, at its expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks (including, but not limited to, insurance sufficient to cover personal injuries caused by Borrower's products in an amount not less than the Obligations), and in such amounts, as ordinarily insured against by other owners in similar businesses conducted in the locations where Borrower's business is conducted on the date hereof. Borrower shall also maintain insurance relating to Borrower's business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to Borrower's.

(b)    All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender (it being hereby acknowledged by Lender that the insurance policies of Borrower in place on the Closing Date are satisfactory). All such policies of property insurance shall contain a lender's loss payable endorsement showing Lender as an additional loss payee thereof, and all liability insurance policies shall show the Lender as an additional insured and Borrower shall use commercially reasonable efforts to have such policies specify that the insurer must give at least twenty (20) calendar days' notice to Lender before canceling its policy for any reason (or ten (10) calendar days for cancellation for nonpayment of premiums). Upon Lender's request (which shall occur once per year excepting for following the occurrence and during the continuance of an Event of Default), Borrower shall deliver to Lender certified copies of such policies of insurance and evidence of the payments of all premiums therefor. All proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations.

6.9    **Accounts.** Except as required under the Bankruptcy Code, rules or policies of the U.S. Trustee, and/or a Bankruptcy Court order, Borrower shall not establish any deposit or securities account after the Closing Date without the approval of the Lender and shall use a cash management system that is the same as or substantially similar to its pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to the Lender in its sole discretion. The Interim Order and Final Order shall provide Lender with a valid and enforceable lien and security interest on the cash held in the Debtors' bank accounts. Borrower agrees to deposit all good faith deposits received from stalking horse bidders or other potential purchasers of the Borrower's assets into a deposit account that is subject to a Lien in favor of Lender.

6.10    **Bankruptcy Sale Process.** The Debtors shall conduct a sale of substantially all of the assets of the Debtors in accordance with the Milestones defined below. The management team of the Debtors shall oversee the sale process on behalf of the Debtors, including all activities of any advisors retained by the Debtors in connection with the sale process, shall at all times be entitled to take any action necessary or appropriate to conduct the sale process, and shall exercise its commercially reasonable efforts to provide SFCC with access to all potential bidders and other interested parties and any information provided to the Debtors by such parties, subject to the terms and conditions set forth in the bidding procedures with respect to the sale process and the Bidding Procedure Order. The Debtors shall provide or cause to be provided to SFCC ongoing status updates (which may be done telephonically) from the management team of the Debtors weekly (or more frequently as reasonably requested by SFCC) in form and substance satisfactory to, and addressing such items as are reasonably requested by SFCC, including addressing the status of the marketing and sale process of the Debtors. Debtors shall also cause its management team to be made available to provide periodic telephonic updates of such reports to SFCC from time to time (but not less than weekly), as reasonably requested by SFCC.

6.11    **Bankruptcy Filings.** Not less than one (1) Business Day prior to filing any motion requesting approval for debtor-in-possession financing, use of cash collateral, and approval of bidding

24

procedures, Borrower shall send copies of such motions to Lender, and all such motions shall be satisfactory to Lender in Lender's Permitted Discretion.

      **6.12**    **Intellectual Property Rights.**

      (a)    Borrower shall execute such documents as Lender may request in its Permitted Discretion for Lender to maintain its perfection in such intellectual property rights to be registered by Borrower, and upon the request of Lender in its Permitted Discretion, shall file such documents simultaneously with the filing of any such applications or registrations.

      (b)    Lender may audit Borrower's Intellectual Property to confirm compliance with this Section.

      **6.13**    **Further Assurances.**  At any time and from time to time Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effect the purposes of this Agreement.

      **6.14**    **Prepetition Loan Documents.**  No Loan Party shall amend, supplement, restate, otherwise modify the Prepetition Loan Documentation or enter into any new Prepetition Loan Documentation without the prior written consent of the Lender, unless such amendments or modifications are approved by the Bankruptcy Court.

      **6.15**    **Debtor-in-Possession Obligations.**  Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

      **6.16**    **Milestones.**  The Debtors shall achieve each of the following milestones (as the same may be extended from time to time with the consent of the Lender, the "**Milestones**"):

      (a)    file the Bankruptcy Sale Motion on or before the date that is five (5) Business Days after the Petition Date;

      (b)    obtain entry of the Interim Order by the Bankruptcy Court on or before the date that is seven (7) Business Days after the Petition Date;

      (c)    obtain entry of the Bidding Procedures Order by the Bankruptcy Court on or before the date that is twenty-one (21) calendar days after the Petition Date;

      (d)    obtain entry of the Final Order by the Bankruptcy Court on or before the date that is twenty-eight (28) calendar days after the Petition Date;

      (e)    the bid deadline set forth in the Bidding Procedures Order shall occur on or before the date that is fifty (50) calendar days after the Petition Date;

      (f)    if qualifying bids are received in accordance with the Bidding Procedures Order, the Debtors shall hold an auction with respect to the Bankruptcy Sale on or before the date that is fifty-five (55) calendar days after the Petition Date;

      (g)    the hearing on the proposed Bankruptcy Sale Order shall be held within three (3) Business Days of the closing of such auction (or if no qualifying bids are received other than from the Stalking Horse Purchaser, on or before the date that is fifty-six (56) calendar days after the Petition Date);

25

(h)    the Debtors shall obtain entry of the Bankruptcy Sale Order authorizing the Bankruptcy Sale to the successful bidder in accordance with the Bidding Procedures Order, in each case in form and substance reasonably acceptable to SFCC on or before the date that is sixty-one (61) calendar days after the Petition Date; and

(i)    the Debtors shall consummate the Bankruptcy Sale in accordance with the terms of the Bankruptcy Sale Order on or before the date that is ten (10) calendar days after the date of entry of the Bankruptcy Sale Order, with an amount equal to the Obligations (including, for the avoidance of doubt, any Lender Expenses then due) and SFCC Prepetition Debt paid directly to SFCC and Candy Cube, as applicable.

6.17    **First Day Orders.**  The Loan Parties shall cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

6.18    **Budget Compliance and Variances.**

(a)    The Loan Parties and their Subsidiaries will use the proceeds of the Loans solely to make disbursements for expenditures provided for in accordance with Section 5.18 and this Section 6.18. The Loan Parties and their Subsidiaries shall not pay any expenses (other than de minimis amounts) or other disbursements (other than de minimis disbursements) other than the type of expenses and disbursements set forth in the Budget. Notwithstanding the foregoing, Debtors shall require written Lender approval to fund any vendor payments (excluding rent) that are individually greater than $5,000 in a given week which are not directly tied to the production, marketing, distribution and sale of its products.

(b)    Beginning on the Petition Date, the Borrower shall not cause expenses to vary from the applicable Budget by (i) more than fifteen percent (15%) below the budgeted amount for cash receipts on a trailing three (3) week basis; or (ii) more than ten percent (10%) in excess of the budgeted amount for cash disbursements on a trailing three (3) week basis (collectively, the "**Permitted Budget Variances**"), provided that to the extent the actual cash receipts in any such period exceed the amounts for such period in the applicable Budget, or if the cash disbursements in any such period are less than the amounts for such period in the applicable Budget, then the "Permitted Budget Variance" for such receipts or disbursements, as applicable, for the next succeeding period shall be increased by an amount equal to such difference (and shall continue to roll over into successive periods to the extent such additional budgeted capacity is unused by Borrower). In the event that actual amounts for total cash receipts and cash disbursements from operations line items and/or professional fees are in excess of the Budget, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variances, it being understood and agreed that the Lender shall have no obligation to fund any amounts in excess of the Budget and Permitted Budget Variances, and it being further agreed that any amounts for professional fees in excess of the Budget shall not be paid by the Debtors until after the Obligations and the SFCC Prepetition Debt are paid in full.

(c)    If the Budget is updated, modified or supplemented by the Borrower, each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance satisfactory to, the Lender and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget. Each Budget delivered to Lender shall be accompanied by such supporting documentation as reasonably requested by the Lender. Each Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable.

26

18102376.4
233739-10002

**6.19    Filing of Motions and Applications**.  Without the prior written consent of the Lender, the Loan Parties shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Orders, (b) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Orders, or (c) permit any Indebtedness or Claim to be pari passu with or senior to any of the Loans, except as expressly stated in the Orders.

**6.20    Superpriority Claim**.  No Loan Party shall incur, create, assume, suffer to exist or permit any other Superpriority Claim that is pari passu with or senior to the claims of the Lender against the Borrower or any of its Subsidiaries, except for the Carve Out, and as otherwise expressly stated in the Orders.

## 7.    NEGATIVE COVENANTS.

No Borrower shall do any of the following:

**7.1    Dispositions**.  Other than in accordance with the Bankruptcy Sale Order, convey, sell, lease, transfer or otherwise dispose of (collectively, a "**Transfer**"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, other than:  (i) Transfers of Inventory in the ordinary course of business (including, without limitation, Transfers of Inventory from Borrower to Sugarfina Canada consistent with past practice); (ii) Transfers of (a) non-exclusive licenses and similar arrangements (including the W&P Design Licensing Agreement) for the use of the property (including Intellectual Property) of Borrower or its Subsidiaries in the ordinary course of business, (b) licenses that could not result in a legal transfer of title of the licensed property but that may be exclusive in respects other than territory, and (c) licenses relating to discreet geographical areas outside of the United States (for the avoidance of doubt and for sake of clarity, however, Borrower may enter into limited non-competition arrangements with its licensees and similar business partners in the ordinary course of business); or (iii) Transfers of worn-out, obsolete or surplus Equipment, (iv) any asset of any Subsidiary to Borrower, (v) assignment of leases or subleases of real property, or (vi) use of cash in the ordinary course of business unless prohibited under the terms of this Agreement or any other Loan Document.

**7.2    Change in Business; Change in Executive Office**.  Engage in any business, or permit any of its Subsidiaries to engage in any business, other than the businesses currently engaged in by Borrower and any business substantially similar or related thereto (or incidental thereto), or cease to conduct business in the manner conducted by Borrower as of the Closing Date; or without thirty (30) calendar days prior written notification to Lender (a) relocate its chief executive office or state of incorporation or change its legal name; (b) add any new offices or business locations or deliver any portion of the Collateral valued, individually or in the aggregate, in excess of One Hundred Thousand Dollars ($100,000) to a bailee other than to a bailee and at a location already disclosed in the Perfection Certificate, or (c) without Lender's prior written consent, change the date on which its fiscal year ends.

**7.3    Mergers or Acquisitions**.  Merge, divide (pursuant to Delaware limited liability company law or any similar statute) or consolidate, or permit any of its Subsidiaries to merge, divide or consolidate, with or into any other business organization, or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock or property of another Person.

**7.4    Indebtedness**.  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, or permit any Subsidiary so to do, other than Permitted Indebtedness.

**7.5    Encumbrances**.  Create, incur, assume or suffer to exist any Lien with respect to any of its property, or assign or otherwise convey any right to receive income, including the sale of any

27

Accounts, or permit any of its Subsidiaries so to do, except for Permitted Liens, or enter into any agreement with any Person other than Lender not to grant a security interest in, or otherwise encumber, any of its property, or permit any Subsidiary to do so.

        **7.6**     **Distributions**. Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any equity interests, except that Borrower may repurchase equity interests from current or former employees, directors, or consultants of Borrower in any amount where the consideration for the repurchase is solely the cancellation of indebtedness owed by such current or former employees, directors or consultants to Borrower regardless of whether an Event of Default exists.

        **7.7**     **Investments**. Directly or indirectly acquire or own, or make any Investment in or to any Person, or permit any of its Subsidiaries so to do, other than Permitted Investments; or maintain or invest any of its property with a Person other than Lender or permit any of its Subsidiaries to do so unless such Person has entered into an account control agreement with Lender in form and substance satisfactory to Lender; or suffer or permit any Subsidiary to be a party to, or be bound by, an agreement that restricts such Subsidiary from paying dividends or otherwise distributing property to Borrower.

        **7.8**     **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person other than and Inventory sold by Borrower to any Affiliate.

        **7.9**     **Prepetition Indebtedness**. Make any payment in respect of any Prepetition Indebtedness, or permit any of its Subsidiaries to make any such payment, except in compliance with the terms of such Prepetition Indebtedness, or amend any provision contained in any documentation relating to the Prepetition Indebtedness except in compliance with the terms of the subordination agreement relating to such Prepetition Indebtedness, or amend any provision affecting Lender's rights contained in any documentation relating to the Prepetition Indebtedness without Lender's prior written consent.

        **7.10**    **Inventory and Equipment**. Store the Inventory or the Equipment with a bailee, warehouseman, or other third party unless the third party has been notified of Lender's security interest and Lender (a) has received an acknowledgment from the third party that it is holding or will hold the Inventory or Equipment for Lender's benefit or (b) is in pledge possession of the warehouse receipt, where negotiable, covering such Inventory or Equipment. Except for Inventory sold in the ordinary course of business, Inventory held for the benefit of a retail location where the aggregate cost of such Inventory does not exceed One Hundred Thousand Dollars ($100,000) and except for such other locations as Lender may approve in writing, Borrower shall keep the Inventory and Equipment only at the locations disclosed in the Perfection Certificate, and such other locations of which Borrower has (i) provided Lender written notice on a weekly basis of all such locations and (ii) taken all necessary action as requested by Lender (subject to the Orders) in order to ensure that assets located at such locations are secured and that Lender has a perfected priority Lien on such assets in accordance with the priority set forth in this Agreement (including, without limitation, executing additional security documentation and using commercially reasonable efforts to obtain landlord waivers, mortgage waivers, bailee waivers, or equipment waivers in form and substance satisfactory to Lender in its Permitted Discretion).

        **7.11**    **Compliance**. Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Credit Extension for such purpose. Fail

28

to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur, or fail to comply with the Federal Fair Labor Standards Act, or violate any law or regulation, which violation could reasonably be expected to have a Material Adverse Effect, or permit any of its Subsidiaries to do any of the foregoing.

## 8.    EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an Event of Default by Borrower under this Agreement:

**8.1    Payment Default.**  Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Cases after accounting for the relief provided in the Orders, if Borrower fails to pay, when due, any of the Obligations;

**8.2    Covenant Default.**

(a)    If Borrower fails to perform any obligation under Article 6, or violates any of the covenants contained in Article 7 of this Agreement;

(b)    If Borrower fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower and Lender and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within ten (10) calendar days after Borrower receives notice thereof or any officer of Borrower becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) calendar day period or cannot after diligent attempts by Borrower be cured within such ten (10) calendar day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional reasonable period (which shall not in any case exceed twenty (20) calendar days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default but no Credit Extensions will be made;

**8.3    Material Adverse Effect.**  If there occurs any circumstance or circumstances that could reasonably be expected to have a Material Adverse Effect;

**8.4    Attachment.**  Other than in connection with the Cases in each case, if any material portion of Borrower's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within ten (10) calendar days, or if Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any material portion of Borrower's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of Borrower's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within ten (10) calendar days after Borrower receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by Borrower (provided that no Credit Extensions will be required to be made during such cure period);

**8.5    Assets.**  (a) the Asset Purchase Agreement is terminated by its terms and a Bankruptcy Sale Order is not entered in connection with a Bankruptcy Sale within five (5) Business Days thereafter, (b) the Debtor moves (or fails to contest in good faith a motion brought by any other Person) to

29

approve a sale or other disposition of substantially all of the Debtor's assets without the consent of the Lender, (c) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral, which rights under Section 506(c) of the Bankruptcy Code shall be waived (subject only to and effective upon entry of the Final Order), (d) any Person attempts to apply the doctrine of marshalling with respect to the Lender, which shall be waived (subject only to and effective upon entry of the Final Order) or (e) any Person attempts to apply the "equities of the case" exception set forth in Section 552(b) of the Bankruptcy Code, which shall be waived (subject only to and effective upon entry of the Final Order);

        **8.6**     **Other Agreements.** Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Cases, if there is a default or other failure to perform in (a) any agreement to which Borrower is a party or by which it is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000) or which could have a Material Adverse Effect or (b) any Prepetition Indebtedness;

        **8.7**     **Prepetition Indebtedness.** If the Obligations or the SFCC Prepetition Debt shall not have the priority contemplated by this Agreement or the Orders, or the entry of any order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations ore the SFCC Prepetition Debt;

        **8.8**     **Judgments.** If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000) (excluding amounts covered by insurance or third party indemnification) shall be rendered against Borrower and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of ten (10) calendar days (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment);

        **8.9**     **Misrepresentations.** If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any certificate delivered to Lender by any Responsible Officer pursuant to this Agreement or to induce Lender to enter into this Agreement or any other Loan Document;

        **8.10**     **Guaranty.** If any Guaranty ceases for any reason to be in full force and effect (other than in accordance with the terms thereof), or any guarantor fails to perform any obligation under any Guaranty or a security agreement securing any Guaranty (collectively, the "**Guaranty Documents**"), or any event of default occurs under any Guaranty Document or any Guarantor revokes or purports to revoke a Guaranty, or any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth in any Guaranty Document or in any certificate delivered to Lender in connection with any Guaranty Document, or if any of the circumstances described in Sections 8.3 through 8.8 occur with respect to any guarantor or any guarantor dies or becomes subject to any criminal prosecution, or any circumstances arise causing Lender, in good faith, to become insecure as to the satisfaction of any of any guarantor's obligations under the Guaranty Documents;

        **8.11**     **Cases.** Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Lender;

        **8.12**     **Trustee.** A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases;

18102376.4
233739-10002

8.13    **Cash Collateral.** An order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties;

8.14    **Relief from Stay.** The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

8.15    **Orders.** The Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender;

8.16    **Compliance with Orders.** Any of the Loan Parties shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) in any material respect;

8.17    **Other Financing.** (a) Except as permitted in the Interim Order or Final Order, the entry of any order of the Bankruptcy Court granting to any third party a Superpriority Claim or Lien pari passu with or senior to that granted to and/or for the benefit of the Lender hereunder, or (b) the Borrower shall make any payment of principal or interest or otherwise on account of any Indebtedness or payables other than the Obligations under the DIP Loan Facility or SFCC Prepetition Debt, or other than in accordance with the Budget approved by the Lender; or

8.18    **Avoidance.** (a) Any suit or action is commenced against the Lender by or on behalf of Borrower that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender, or (b) the Bankruptcy Court rules in favor of any Person in any suit or action commenced against the Lender by or on behalf of such Person (after the Bankruptcy Court has granted such Person standing to commence such suit or action).

9.    **LENDER'S RIGHTS AND REMEDIES.**

9.1    **Rights and Remedies.** Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Borrower:

(a)    Subject to the Orders, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the DIP Loan Facility with respect to additional Advances, whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Loan to the Default Rate.

(b)    Subject to the Orders, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court: (i) terminate the DIP Loan Facility with respect to further Advances; (ii) reduce the DIP Loan Commitments from time to time; (iii) declare all or any portion of the Obligations, including all or

31

any portion of the Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower; or (iv) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, provided, however, notwithstanding anything to the contrary contained herein, that Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon five (5) Business Days' prior written notice to Borrower, counsel approved by the Bankruptcy Court for the Committee and the U.S. Trustee and as set forth in the Interim Order or Final Order (when applicable).

(c)    Waivers by Borrower. Except as otherwise provided for in this Agreement or by applicable law, Borrower waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

**9.2    [Reserved].**

**9.3    [Reserved].**

**9.4    Lender Expenses.** If Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Lender may do any or all of the following after reasonable notice to Borrower: (a) make payment of the same or any part thereof; (b) set up such reserves as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type discussed in Section 6.8 of this Agreement, and take any action with respect to such policies as Lender deems prudent. Any amounts so paid or deposited by Lender shall constitute Lender Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Event of Default under this Agreement.

**9.5    Lender's Liability for Collateral.** So long as Lender complies with reasonable commercial lending practices, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever. All risk of loss, damage or destruction of the Collateral shall be borne by Borrower.

**9.6    Remedies Cumulative.** Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, subject to the requirements of the Bankruptcy Code. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on Borrower's part shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it. No waiver by Lender

18102376.4
233739-10002

shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

**9.7    Demand; Protest**. Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrower may in any way be liable.

**9.8    Borrower Liability.** Any Borrower may, acting singly, request Credit Extensions hereunder. Each Borrower hereby appoints each other as agent for the other for all purposes hereunder, including with respect to requesting Credit Extensions hereunder. Each Borrower hereunder shall be jointly and severally obligated to repay all Credit Extensions made hereunder, regardless of which Borrower actually receives said Credit Extension, as if each Borrower hereunder directly received all Credit Extensions. Each Borrower waives (a) any suretyship defenses available to it under the Code or any other applicable law, including, without limitation, the benefit of California Civil Code Section 2815 permitting revocation as to future transactions and the benefit of California Civil Code Sections 1432, 2809, 2810, 2819, 2839, 2845, 2847, 2848, 2849, 2850, and 2899 and 3433, and (b) any right to require Lender to: (i) proceed against any Borrower or any other person; (ii) proceed against or exhaust any security; or (iii) pursue any other remedy. Lender may exercise or not exercise any right or remedy it has against any Borrower or any security it holds (including the right to foreclose by judicial or non-judicial sale) without affecting any Borrower's liability. Notwithstanding any other provision of this Agreement or other related document, each Borrower irrevocably waives all rights that it may have at law or in equity (including, without limitation, any law subrogating Borrower to the rights of Lender under this Agreement) to seek contribution, indemnification or any other form of reimbursement from any other Borrower, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by Borrower with respect to the Obligations in connection with this Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by Borrower with respect to the Obligations in connection with this Agreement or otherwise. Any agreement providing for indemnification, reimbursement or any other arrangement prohibited under this Section 9.8 shall be null and void. If any payment is made to a Borrower in contravention of this Section 9.8, such Borrower shall hold such payment in trust for Lender and such payment shall be promptly delivered to Lender for application to the Obligations, whether matured or unmatured.

**9.9    Protective Payments**. If Borrower fails to obtain the insurance called for by Section 6.8 or fails to pay any premium thereon or fails to pay any other amount which Borrower is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Lender may obtain such insurance or make such payment, and all amounts so paid by Lender are Lender Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral. Lender will make reasonable efforts to provide Borrower with notice of Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter. No payments by Lender are deemed an agreement to make similar payments in the future or Lender's waiver of any Event of Default.

**9.10    Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Advances made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Advances made hereunder are repaid in full the total

33

interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lender and Borrower to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the Advances made hereunder or be refunded to Borrower.

      **9.11**    **Agency, Exculpation, Lender Actions**.

      (a)    Candy Cube hereby appoints SFCC as its agent hereunder and under the other Loan Documents and authorizes SFCC to take such actions on its behalf and to exercise such powers as are delegated to SFCC by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.

      (b)    SFCC shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, (i) SFCC shall not be subject to any fiduciary or other implied duties, regardless of whether a default or Event of Default has occurred and is continuing, (ii) SFCC shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that SFCC is required to exercise in writing by Candy Cube, and (iii) except as expressly set forth herein and in the other Loan Documents, SFCC shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Debtors that is communicated to or obtained by SFCC in any capacity. Subject to Section 9.11(d), SFCC shall not be liable for any action taken or not taken by it in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. SFCC shall be deemed not to have knowledge of any default or Event of Default unless and until written notice thereof is given to SFCC by the Debtors or Candy Cube, and SFCC shall not be responsible for or have any duty to ascertain or inquire into (1) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (2) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, (4) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (5) the creation, perfection or priority of any Lien purported to be created by the Loan Documents or the value or the sufficiency of any Collateral or (6) the satisfaction of any condition set forth in Section 3 or elsewhere herein or therein, other than to confirm receipt of items expressly required to be delivered to SFCC. In the event that SFCC obtains such actual knowledge or receives such notice, SFCC shall give prompt notice thereof to Candy Cube.

      (c)    Any references hereunder to (i) actions required or permitted to be taken by the Lender (other than with respect to any Lender's commitment to make Advances set forth in Section 2.1), and (ii) consents, approvals or waivers required or permitted to be taken by the Lender, shall be taken or given solely by SFCC, provided that (x) no amendment shall, without Candy Cube's prior written consent, extend the Maturity Date, reduce the outstanding principal amount of the Obligations, modify the interest rate (other than charging default interest after the occurrence of an Event of Default), permit any assignment by a Debtor of its obligations hereunder, release any Collateral (except in connection with a Bankruptcy Sale Order), modify the affirmative covenants set forth in Section 6.16 or 6.18, modify the Events of Default set forth in Article 8 or increase the DIP Loan Commitment, and (y) SFCC shall not, without Candy Cube's

18102376.4
233739-10002

prior written consent, either (1) waive any Event of Default hereunder, or (2) agree to any modification to the Budget in excess of ten percent (10%) in the aggregate for any week.

(d)     If after the occurrence of an Event of Default Candy Cube requests in writing that SFCC take a particular action to enforce the Lender's rights and remedies and SFCC fails to make good faith efforts to commence such an enforcement action within five (5) Business Days of receiving such written notification, Candy Cube may offer to sell to SFCC (and SFCC shall, within five (5) Business Days of receiving such written offer, purchase) at par that portion of the unpaid principal balance of the DIP Loan owned by Candy Cube, including all accrued and unpaid interest payable to Candy Cube, and, solely to the extent approved by the Bankruptcy Court in a Final Order, Candy Cube's pro rata share of the fee set forth in Section 2.6(a) hereof, it being acknowledged by Candy Cube that if Candy Cube offers to sell to SFCC its share of the DIP Loans, then Candy Cube shall have no right to receive payment on account of the fee set forth in Section 2.6(b) hereof unless such sale offer is based solely upon a proposed Budget modification described in Section 9.11(c)(2) hereof (and that payment of such fee described in Section 2.6(b) hereof shall be deferred until one (1) Business Day after the date that such fee is actually received by SFCC, if ever), and it being further acknowledged by Candy Cube that if Candy Cube fails to object to a proposed course of action by SFCC, then Candy Cube shall be deemed to have consented to such proposed course of action by SFCC.

**10.    NOTICES.**

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below. Lender or Borrower may change its mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Section 10:

If to Borrower:         Sugarfina, Inc.
                        Sugarfina International, LLC
                        Sugarfina (Canada) Ltd.
                        1700 East Walnut Avenue
                        El Segundo, CA 90245
                        Attn:  Lance Miller
                        email: lance.miller@sugarfina.com

                        With a copy to (which does not constitute notice):

                        Darío D. Avram
                        Morrison & Foerster LLP
                        425 Market Street
                        San Francisco, CA 94105
                        Email:  DarioAvram@mofo.com

                        and

                        Alan J. Friedman

18102376.4
233739-10002

                    Shulman Hodges & Bastian LLP
                    100 Spectrum Center Drive, Suite 600
                    Irvine, CA 92618
                    Email:  afriedman@shbllp.com

If to SFCC:           SFCC Loan Investors, LLC
                    2148 Jimmy Durante Boulevard, Suite B
                    Del Mar, CA 92014
                    Attention: Charlie Monts
                    Email: charlie@366development.com

                    With a copy to (which does not constitute notice):

                    Loeb & Loeb LLP
                    10100 Santa Monica Boulevard, Suite 2200
                    Los Angeles, CA 90067
                    Attention: Lance Jurich, Esq.
                    Email: ljurich@loeb.com

If to Candy Cube:    TerraMar Capital LLC
                    12100 Wilshire Blvd., Ste 1750
                    Los Angeles, CA  90025
                    Attention:  Joshua Phillips
                    Email: jphillips@terramarcapital.com

                    With a copy to (which shall not constitute notice):

                    McDonald Hopkins LLC
                    300 North LaSalle Street
                    Suite 1400
                    Chicago, IL 60654
                    Attention:  Marc Carmel
                    Email: mcarmel@mcdonaldhopkins.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**11.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE.**

Except as otherwise expressly provided in any of the Loan Documents, California law governs the Loan Documents without regard to principles of conflicts of law.  Borrower and Lender each submit to the exclusive jurisdiction of the Bankruptcy Court; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Lender from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Lender.  Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court.  Borrower hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified

36

18102376.4
233739-10002

mail addressed to Borrower at the address set forth in, or subsequently provided by Borrower in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of Borrower's actual receipt thereof or three (3) calendar days after deposit in the U.S. mails, proper postage prepaid.

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Los Angeles County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Los Angeles County, California; and the parties hereby submit to the jurisdiction of such court. The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure Sections 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Los Angeles County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure Section 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

This Section 11 shall survive the termination of this Agreement.

12.    **GENERAL PROVISIONS.**

12.1    **Successors and Assigns**. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by Borrower or, prior to the occurrence of an Event of Default, Lender, without the other's prior written consent, which consent may be granted or withheld in such party's sole discretion.

37

18102376.4
233739-10002

**12.2    Indemnification.** Borrower shall defend, indemnify and hold harmless Lender and its officers, employees, and agents (each an "**Indemnified Party**") against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all losses or Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and Borrower whether under this Agreement, the DIP Loan Facility, the Cases, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by an Indemnified Party's gross negligence or willful misconduct. This Section 12.2 shall not apply to Taxes.

**12.3    Time of Essence.** Time is of the essence for the performance of all obligations set forth in this Agreement.

**12.4    Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**12.5    Amendments in Writing, Integration.** Except as expressly set forth herein, all amendments to or terminations of this Agreement or the Loan Documents must be in writing signed by each of the parties hereto.  All prior agreements, understandings, representations, warranties, and negotiations between any of the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

**12.6    Counterparts.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

**12.7    Electronic Execution of Documents.**  The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**12.8    Survival.** All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions to Borrower. The obligations of Borrower to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 12.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**12.9    Confidentiality; Disclosure.** In handling any confidential information Lender and all employees and agents of Lender, including but not limited to accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to the subsidiaries or affiliates of Lender in connection with their present or prospective business relations with Borrower, (ii) to prospective transferees or purchasers of any interest in the loans, provided that they are similarly bound by confidentiality obligations, (iii) as required by law, regulations, rule or order, subpoena, judicial order or similar order (including in connection with the Cases), (iv) as may be required in connection with the examination, audit

38

18102376.4
233739-10002

or similar investigation of Lender and (v) as Lender may determine in connection with the enforcement of any remedies hereunder.  Confidential information hereunder shall not include information that either: (a) is in the public domain or in the knowledge or possession of Lender when disclosed to Lender, or becomes part of the public domain after disclosure to Lender through no fault of Lender; or (b) is disclosed to Lender by a third party, provided Lender does not have actual knowledge that such third party is prohibited from disclosing such information.  Borrower authorizes Lender to disclose its relationship with Borrower, including use of Borrower's logo in Lender's promotional materials.

      **12.10    Patriot Act Notice**.  Lender notifies Borrower that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies Borrower, which information includes names and addresses and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

      **12.11    Correction of Loan Documents**.  Lender may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

[SIGNATURE PAGE FOLLOWS]

18102376.4
233739-10002

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**Borrower:**

**SUGARFINA, INC.**

By: _____
Name: *Lance miller*
Title: *chief Restructuring officer*

**SUGARFINA INTERNATIONAL, LLC**

By: _____
Name: *Lance miller*
Title: *Chief Restructuring officer*

**SUGARFINA (CANADA), LTD.**

By: _____
Name: *Lance miller*
Title: *Chief Restructuring officer*

[Signature Page 1 to Debtor-in-Possession Loan and Security Agreement]

**Lenders:**

**SFCC LOAN INVESTORS, LLC**
By: Serene Investment Management, LLC, its manager

By:_____
Name:  Adam Phillips
Title:   Manager

[Signature Page 2 to Debtor-in-Possession Loan and Security Agreement]

CANDY CUBE HOLDINGS, LLC

By: _Joshua Phillips_____
Name: Joshua Phillips
Title: Manager

**Exhibit A**

### COLLATERAL DESCRIPTION ATTACHMENT
### TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

All property and other assets, whether real or personal, tangible or intangible, or otherwise, of Borrower (herein referred to as "Borrower" or "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a)       all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims (including, but not limited to, any commercial tort claims against Global Retail Limited and Sweitzer LLC/Sweitzer Lakewood LLC and any claims held by Sugarfina against its former production/fulfillment vendor, MNS), deposit accounts and any and all monies credited by or due from any financial institution or any other depository, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles and software, and, with respect to intellectual property rights, solely the Intellectual Property), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), vehicles, customer lists, credit files, tax assets, real property and/or leasehold rights, all intercompany claims, investment property (including securities, securities entitlements, ownership interests in corporations, partnerships and limited liability companies), letter of credit rights, cash or cash equivalents, and all of Debtor's books and records, with respect to any of the foregoing, and the computers and equipment containing said books and records;

(b)       any claims and causes of action under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, all rights arising under or in connection with any Avoidance Actions; and

(c)       any and all ascensions to, substitutions for and replacements, cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds (including, without limitation, policies for the benefit of directors and officers of Borrower), and all supporting obligations and the security therefor or for any right to payment. All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time.

18102376.4
233739-10002

**Exhibit B**

**DIP LOAN COMMITMENT SCHEDULE**

| Name of Lender | Amount of DIP Loan Commitment |
|---|---|
| SFCC Loan Investors, LLC | $3,000,000 |
| Candy Cube Holdings, LLC | $1,000,000 |
| Total: | $4,000,000 |

18102376.4
233739-10002